No. 02-359

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 303

IN THE MATTER OF N.A., B.A., and A.A.,

Youths in Need of Care.



FILED

DEC 12 2002

Ed Smith
CLERK OF THE SUPREME COURT
STATE OF MONTANA

APPEAL FROM:     District Court of the Sixteenth Judicial District,
                 In and for the County of Custer,
                 Honorable Gary L. Day, Judge Presiding

COUNSEL OF RECORD:

    For Appellant:

        John Houtz, Attorney at Law, Forsyth, Montana

    For Respondent:

        Honorable Mike McGrath, Attorney General; Ilka Becker, Assistant
        Attorney General; Helena, Montana

        Garry P. Bunke, Assistant Attorney General; Miles City, Montana

        Coleen I. Magera, County Attorney, Miles City, Montana

        Janette Krutzfeldt Jones, Krutzfeldt & Jones, LLP, Miles City,
        Montana (Guardian Ad Litem)

Submitted on Briefs:   October 31, 2002

Decided:   December 12, 2002

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Steven, the natural father of B.A. and A.A., appeals from the findings of fact and conclusions of law entered by the Sixteenth Judicial District Court, Custer County, terminating his parental rights and awarding permanent legal custody to the Montana Department of Public Health and Human Services (Department) with the right to consent to adoption. Steven also appeals the District Court's denial of his request for post-termination visitation with the children. We affirm.

¶2 Steven raises the following issues on appeal:

¶3 **1. Did the District Court err in terminating the parental rights of Steven?**

¶4 **2. Did the District Court err when it denied Steven visitation with the children after terminating his parental rights?**

## BACKGROUND

¶5 Shelly is the natural mother of B.A., A.A. and N.A (children), currently ages 7, 4, and 14 respectively. Shelly does not appeal the termination of her parental rights. Ross is the natural father of N.A. Ross did not appear in the District Court nor complete any court-ordered requirements. Ross does not appeal the termination of his parental rights. Steven is the natural father of B.A. and A.A. Although Steven is not the natural father of N.A., Steven requested that the District Court allow him post-termination visitation and contact with all three children. Shelly and Steven were never married and have had only an intermittent relationship over approximately eight years. Steven has never taken an active role in parenting the children.

2

¶6 The Department first became involved with Shelly's children in early 1990 and substantiated a report of physical neglect related to her severe intoxication. In 1991, the Department documented a second, similar incident involving physical neglect, excessive use of alcohol, and interpersonal problems with family members. Five years later, in 1996, the Department received four additional reports of physical abuse by Shelly. Subsequent to the fourth report, the Department removed the children from Shelly's home and placed the children in foster care. Shortly thereafter, the children were returned to Shelly's care with family based services for ninety days. In December 1996, Shelly stipulated and agreed to consent to the Department's Petition for Temporary Investigative Authority and Protective Services (TIA).

¶7 The Department again became involved with Shelly in March 1997, and again placed N.A. and B.A. in licensed foster care because of another incident of severe intoxication. The District Court continued the Department's TIA through June 1997. It granted temporary legal custody (TLC) to the Department in that same month. The children were again returned to Shelly's home with family based services in May 1998. The District Court subsequently dismissed the TLC in September 1998.

¶8 The Department did not become involved with Shelly and her children again until February 1999 when both the Department and the Miles City Police Department responded to a call of possible domestic abuse between Shelly and her friend Sam. Because of her condition, Shelly was admitted to Deaconess Psychiatric Center for the third time in March 1999. Also in March, because of concern that Shelly's condition did not make it possible for

3

her to properly take care of the children, Shelly's mother and stepfather took the children to their home in Mobridge, South Dakota.

¶9 In July 1999, the Miles City Police Department charged Shelly with a DUI and careless driving after she became severely intoxicated and drove her car over a dike. Because of her condition, the Police Department transported Shelly to Deaconess Psychiatric Center. By August 1999, the Department had begun working in conjunction with Shelly's therapist in an attempt to stabilize Shelly's living situation.

¶10 By October, Shelly was seeing her therapist and taking her medications on a regular basis. She obtained appropriate housing and felt she was stable enough to begin parenting her children again. She thus went to Mobridge to pick up the children from her mother and stepfather and returned with them to Miles City.

¶11 The Department thereafter attempted to provide the developmental assessment, educational, and support services necessary to keep the children safely in Shelly's home, including arranging and paying for daycare and enrolling B.A. in the Headstart program. However, on October 21, 1999, the Miles City Police Department arrested Kurt Kiltie, a friend of Shelly, and charged him with a DUI. B.A. was found in his vehicle. After an investigation, the Department determined that Shelly had known that Kiltie had been drinking all day when she allowed four-year-old B.A. to ride in the car with him.

¶12 In January 2000, Shelly did not allow the Department to transport A.A. to an evaluation that had been planned weeks in advance. The Department also received another report of physical abuse of B.A. by Shelly and two additional reports of A.A.'s

4

developmental delays and lack of routine medical care. After further investigation of these reports, the Department removed the children from Shelly's home and placed them in foster care.

¶13 The Department filed its petition for TLC on January 18, 2000. Both Shelly and Steven were present at the scheduled hearing. The minutes of the hearing reflect that the parties reached an agreement wherein Shelly and Steven stipulated to temporary legal custody of the children. The record reflects, however, that Steven did not sign the written stipulation. The Department requested a continuance of TLC on October 6, 2000. Shelly attended the November 9 hearing with her attorney. Steven, although legally served, did not attend the hearing and did not sign his court-ordered treatment plan. Shelly again stipulated to temporary legal custody.

¶14 The Department again petitioned for continuance of TLC on February 9, 2001. In an affidavit attached to the petition, Tere Gabel (Gabel), a social worker with the Department, stated that she had sent three letters to Steven, on December 4 and 14, 2000, and on January 8, 2001, requesting that Steven come to Gabel's office to discuss his court-ordered treatment plan. Steven eventually met with Gabel on January 9, 2001, and January 12, 2001. According to Gabel's affidavit, Steven stated that he did not feel he could parent the children, even with the help of Shelly, but that he does want to visit the children on occasion. The affidavit also noted that Steven was comfortable with the children being in foster care and that he did not feel he could complete the court-ordered treatment plan. Steven had not to that point requested any visitation with the children.

5

¶15 On March 12, 2001, two days prior to the hearing on the Department's motion to extend TLC, Steven filed a motion with the court for visitation of B.A. and A.A., asking to see them every weekend, every other holiday, and one-half of the summer. After the March 14 hearing, at which Shelly and Steven were both present with counsel, the District Court ordered, in part, that Steven should exercise supervised visitation. Steven signed the treatment plan.

¶16 The District Court also adjudicated the children as youths in need of care, finding by a preponderance of the evidence that dismissal of the petition would create a substantial risk of harm to the children or be a detriment to the children's physical or psychological well-being. It also ordered that Steven complete a treatment plan in an attempt to address his mental and emotional stability issues and parenting deficiencies and to provide him with the necessary skills to provide for the children's physical, emotional and medical needs. The treatment plan required Steven to participate in medical and psychological evaluations, maintain an adequate home environment, maintain income from employment, attend counseling, maintain regular visitation with his children pursuant to a visitation agreement, and maintain weekly contact with his counselor.

¶17 The Department filed a petition for permanent legal custody and termination of parental rights with right to consent to adopt on June 14, 2001. The petition cited Steven's failure to obtain a medical and/or psychological diagnosis and treatment through a physician or psychologist, failure to attend family/individual counseling sessions, failure to follow his counselor's recommendations, and failure to maintain weekly contact with his social worker.

6

¶18 Steven filed a second motion for visitation of B.A. and A.A. on August 3, 2001. The brief states that, "although Steven himself feels he may be inadequate to be the custodial parent of these children, he does want significant visitation of the children." Steven argued in the brief that Shelly had interfered with his attempted visitation and that he had not been allowed any meaningful visitation by the Department.

¶19 The Department objected to Steven's motion, noting that it was seeking termination of Steven's parental rights, that Steven had open visitation but failed to avail himself of the opportunity, that Steven failed to appear at his last scheduled visitation and that Steven had requested no further visitation with the children after missing his previous scheduled visitation. The court-appointed special advocate, Toni Gaglia, reported to the court on December 13, 2001, that Steven had made no request for visitation to the Department since June 10, 2001.

¶20 The District Court held its termination hearing on December 13 and 14, 2001. By that time, B.A. and A.A. had been in foster care for a period of 24 months. Steven was not present at the December 13 hearing because he had begun a new medication and was "real anxious." The District Court entered its findings of fact, conclusions of law and order on February 5, 2001, terminating Shelly's, Steven's, and Ross's parental rights to the children and granting permanent legal custody of B.A. and A.A. to the Department with authority to consent to adoption. The District Court appointed N.A.'s maternal grandmother, Linda, as guardian and conservator of N.A., with the right of the Department to seek termination upon proper petition to the court. The District Court denied Steven's request for post-termination

7

supervised visitation of B.A. and A.A., concluding that it would be unfair and not in the best interests of B.A. or A.A. to continue supervised visitation after termination of Steven's parental rights.

¶21 Steven now appeals the termination of his parental rights and the denial of post-termination visitation.

*STANDARD OF REVIEW*

¶22 We review a district court's decision to terminate parental rights to determine whether the district court abused its discretion. *In re E.K.*, 2001 MT 279, ¶ 31, 307 Mont. 328, ¶ 31, 37 P.3d 690, ¶ 31. On review of a decision to terminate parental rights, we determine whether the district court's findings of fact supporting termination are clearly erroneous. *In re B.H.*, 2001 MT 288, ¶ 13, 307 Mont. 412, ¶ 13, 37 P.3d 736, ¶ 13. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if upon on reviewing the record, this Court is left with the definite and firm conviction that the district court made a mistake. *In re E.K.*, ¶ 31. In reviewing a district court's conclusions of law, we determine if they are correct. *In re E.K.*, ¶ 31.

¶23 In determining whether to terminate parental rights, the district court is bound to give primary consideration to the physical, mental, and emotional conditions and needs of the children, thus the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights. *In re E.K.*, ¶ 33 (citing *In re J.W.*, 2001 MT 86, ¶ 8, 305 Mont. 149, ¶ 8, 23 P.3d 916, ¶ 8). We will presume that

8

a district court's decision is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion. *In re E.K.*, ¶ 33.

*DISCUSSION*

¶24 **1. Did the District Court err in terminating the parental rights of Steven?**

¶25 The District Court concluded that Steven did not comply with either treatment plan in that he did not attend counseling, failed to maintain consistent contact with his children and voluntarily discontinued visitation altogether. The District Court relied on the testimony of psychologist Dawn Birk, Ph.D, finding that Steven suffered from bipolar disorder with psychotic features and that Steven would unlikely be able to independently care for the children because of his severe mental illness.

¶26 The District Court further relied on Dr. Birk's testimony that Steven presented as confused and angry, and that Steven's mental stability could deteriorate rapidly if confronted with the stress of parenting, finally concluding that the children should not be placed in Steven's care absent supervision.

¶27 The District Court also relied on Steven's own testimony about his recent problems, including problems with his psycho tropic medication which caused him to be very sick and suicidal. Further, Steven was committed to the Montana State Mental Hospital and was living in a group home at the time of the termination hearing. The District Court relied on Steven's testimony that he was unable to provide care for his children because of the

9

limitations of his mental health, his living arrangements, and his lack of recent contact with the children.

¶28 The District Court thus concluded that Steven failed to complete his treatment plan and that the condition making him unable to parent his children was unlikely to change within a reasonable time.

¶29 On appeal, Steven does not argue that the District Court erred in adjudicating the children as youths in need of care, nor does he challenge the appropriateness of his two treatment plans. Rather, Steven argues that the evidence presented by the Department was insufficient to prove by clear and convincing evidence that he did not complete his treatment plan or that the condition making him unfit to parent is unlikely to change within a reasonable time. Steven contends that the evidence from the Department's main witness, Dr. Birk, is inconsistent and could be construed as favoring continued contact rather than termination of parental rights.

¶30 The party seeking to terminate parental rights "must present clear and convincing evidence to the district court that the prerequisite statutory criteria for termination have been met." *In re M.T.*, 2002 MT 174, ¶ 26, 310 Mont. 506, ¶ 26, 51 P.3d 1141, ¶ 26 (citation omitted). In cases involving the termination of parental rights, clear and convincing proof is simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of proof. This requirement does not call for unanswerable or conclusive evidence. The quality of proof, to be clear and convincing, is

somewhere between the rule in ordinary civil cases and the requirement of criminal procedure–that is, it must be more than a mere preponderance but not beyond a reasonable doubt. *In re M.T.*, ¶ 26 (citation omitted).

¶31 Steven contends that the evidence did not clearly and convincingly establish noncompliance with the treatment plans, and, notwithstanding admission of his inability to independently parent his children, the evidence submitted does not indicate that he is unable to parent when he is "medically-compliant." Steven argues that the counseling he received from Dr. Birk satisfied the requirement in his treatment plan that he obtain a medical and/or psychological diagnosis and treatment through a physician or psychologist. Steven also submitted, in May 2001, a certificate of completion for the "Its all about Parenting" series which, he contends, fulfilled the requirement that he complete parenting classes. Steven also notes that he participated in visitation with his children until a relapse of his mental illness in June 2001, at a time when his doctors were in the process of changing his medications and when he also quit taking his medication for a short time, causing him to become sick and suicidal.

¶32 Steven characterizes the testimony of Dr. Birk as testimony that "may be based on conjecture" because no evidence existed that Steven abused or neglected the children and because the testimony of other witnesses supported a finding that Steven and the children care for each other and wanted to be together, "if not always then at least sometimes."

¶33 The Department responds that, by Steven's own admission, he is unable to parent either of his children, he did not comply with the treatment plan's requirements to maintain

11

weekly contact with his social worker and failed to request further visitation with B.A. and A.A. after voluntarily discontinuing visitation due to illness. The Department also notes that Steven testified at the termination hearing that he knew he could set up visits with the children if he merely requested further visitation from the Department. Steven testified that he did not do so because he "wasn't in the right frame of mind" when he was having trouble with his medication in June 2001. However, he also testified that he had not yet, as of December, attempted to set up visitation with the children.

¶34 The Department also noted Dr. Birk's testimony that Steven suffered from severe bipolar disorder and was showing psychotic features, primarily paranoid delusions. Dr. Birk testified that, at the time she evaluated Steven, it was unlikely that he could care for the children due to his severe mental health problems.

¶35 The Guardian *ad Litem* (Guardian) for the children likewise responds that, by Steven's own admission, his mental illness made him incapable of being a full-time parent, a role that he admittedly did not want to assume, and that he admittedly failed, due to mental illness, to maintain committed contact with B.A. and A.A. The Guardian also contends that Steven's psychological evaluation from Dr. Birk did not satisfy the requirements of the treatment plan because it merely resulted in a diagnosis without further meaningful treatment, essentially arguing that Steven failed to follow Dr. Birk's recommendations to obtain further medical and/or mental health care.

¶36 Steven's contention that he did substantially comply with his treatment plan ignores this Court's long-standing principle that partial compliance or substantial compliance with

a treatment plan is insufficient. *In the Matter of D.H.*, 2001 MT 200, ¶ 30, 306 Mont. 278, ¶ 30, 33 P.3d 616, ¶ 30 (citing *In the Matter of A.N.*, 2000 MT 35, ¶ 45, 298 Mont. 237, ¶ 45, 995 P.2d 427, ¶ 45). The record indicates and Steven concedes that he did not participate in visitation with the children as required by the treatment plan, and that he did not request visitation from the Department even after his mental problems in June 2001, even though conceding he knew the Department would schedule visitation upon request. By Steven's own admission, he did not maintain weekly contact with his social worker.

¶37    Further, we find compelling the Guardian's argument that Dr. Birk's psychological evaluation did not satisfy the requirements of the treatment plan. According to Dr. Birk's own testimony, she did not anticipate becoming a treatment professional for Steven once the evaluation was completed, but anticipated only the limited involvement required in completing with Steven a brief psychological evaluation. Dr. Birk testified that she recommended to Steven that he become involved in counseling and obtain information relevant to parenting, such as participating in parenting classes.

¶38    At the permanent legal custody hearing, Steven testified that he had started seeing a counselor by the name of Steve Lee and that he felt he should continue in counseling. The record does not demonstrate the extent of this counseling with Steve Lee, whether it was only a single session or more, nor does the record contain any written evaluation or progress report by Mr. Lee. Steven's testimony merely reflects that he had "started" seeing Mr. Lee.

¶39    In light of the above evidence, however, we conclude that the District Court's determination that Steven did not comply with his treatment plan pursuant to § 41-3-

13

609(1)(f), MCA, is supported by substantial evidence and is thus, not clearly erroneous. *In re B.H.*, ¶ 13. By Steven's own admissions, he did not successfully complete the treatment plan, and we cannot premise error in the District Court simply because Steven may have partially complied with a portion of the treatment plan by beginning counseling sometime near the time of the permanent legal custody hearing.

¶40 Accordingly, we hold that the District Court did not err in concluding that Steven did not comply with the treatment plan and that he, therefore, failed to successfully complete the treatment plan.

¶41 The District Court also received substantial evidence to conclude that Steven's bipolar disorder and severe mental illness rendering him unfit to parent was unlikely to change within a reasonable time.

¶42 Dr. Birk testified that, at the time she evaluated Steven, it was unlikely that he could care for the children due to his severe mental health problems. Dr. Birk found particularly disconcerting Steven's confusion about the date of his appointment, confusion about some of the reasons for being involved in a mental health evaluation, and his refusal to allow his attorney to provide Dr. Birk with any information. According to Dr. Birk, Steven was concerned that people were trying to harm him in some way. Accordingly, Dr. Birk testified:

> And so given his somewhat confused state, as well as his responses to the standardized assessments which suggest a significant degree of anger, I was quite fearful that he might deteriorate very rapidly if he had the children unsupervised and they became unruly and that he wouldn't be able to handle the situation, which might lead to some type of an abusive-type situation.

¶43 Dr. Birk recommended further counseling which Steven subsequently failed to successfully complete. Furthermore, Steven's testimony at the permanent legal custody hearing demonstrated that his condition was not yet resolved or medically controlled when he testified that he did not want to be a full-time parent because he just did not think he was "mentally capable" at that point. Steven was too unstable and "anxious" to even attend the first day of the permanent legal custody hearing. As previously noted, the children had already been in foster care for 24 months by the time of the hearing. Steven had been given sufficient time to comply with the treatment plan if he wished to do so. He admittedly did not wish to comply nor did he believe that he could successfully complete the treatment plan because of his mental illness.

¶44 In determining whether the conduct or condition of a parent is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of a parent renders the parent unfit, unable, or unwilling to give the child adequate parental care. Section 41-3-609(2), MCA; *In the Matter of D.H.*, ¶ 31.

¶45 In making such determination, the court shall consider the emotional illness, mental illness, or mental deficiency of the parent and consider whether the duration or nature of the illness or deficiency will render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time. Section 41-3-609(2)(a), MCA. In weighing the competing interests of parent and child, the court must give primary

consideration to the physical, mental, and emotional conditions and needs of the child. Section 41-3-609(3), MCA; *In the Matter of D.H.*, ¶ 32 (citation omitted).

¶46 We conclude that the testimony of Dr. Birk, in conjunction with Steven's own testimony and conduct, provide substantial evidence to support the District Court's conclusion that Steven's bipolar disorder and severe mental illness, making him unfit to parent, is a condition unlikely to change within a reasonable time. The District Court correctly concluded that the physical, mental, and emotional conditions and needs of the children would be best served by the termination of Steven's parental rights.

¶47 Accordingly, we hold that the District Court did not err in terminating Steven's parental rights.

¶48 **2. Did the District Court err when it denied Steven visitation with the children after terminating his parental rights?**

¶49 Steven argues that § 41-3-445(5), MCA, provides legal authority for the District Court to allow visitation for a parent whose rights are terminated. Subsection (5) provides in part:

> In its discretion, the court may enter any other order that it determines to be in the best interests of the child that does not conflict with the options provided in subsection (6) . . . .

¶50 In the matter currently before this Court, we need not analyze whether the granting of visitation to a parent whose parental rights have been terminated conflicts with any portion of subsection (6). Subsection (5) allows a district court discretion to enter any other order that it determines "to be in the best interests" of the children. Accordingly, the District Court concluded:

16

> If [Steven] cannot provide stability, continuity and the basic parenting skill that his children need, it is unfair to the children to continue his parental rights with supervised visitation. [B.A. and A.A.] deserve a meaningful relationship with a parent who can provide physical, emotional and psychological care giving 100% of the time.
>
> . . . .
>
> The best interests of the minor children [B.A. and A.A.], would be best served by the termination of the parent-child legal relationship . . . of [Steven].

¶51 The District Court considered Steven's visitation request and, in light of the evidence of Steven's mental illness, in its discretion denied Steven's request for post-termination visitation, concluding that such visitation would not be in the best interests of the children. We hold that the District Court did not abuse its discretion in so concluding.

¶52 The decision of the District Court is affirmed accordingly.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

17