No. 03-687

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 172

In the Matter of M.R.G.,

    Youth In Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. ADJ 98-156-Y
The Honorable Thomas McKittrick, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Vince van der Hagen, Deputy Public Defender, Great Falls, Montana

        For Respondent:

        Honorable Mike McGrath, Montanan Attorney General, Mark W. Mattioli, Assistant Attorney General, Helena, Montana; Brant Light, Cascade County Attorney, Gina Bishop, Deputy County Attorney, Great Falls, Montana

Submitted on Briefs:  March 16, 2004

Decided:  June 29, 2004

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    L.G., the mother of M.R.G., appeals an order of the District Court for the Eighth Judicial District, Cascade County, terminating her parental rights to M.R.G. We affirm.

¶2    The issues on appeal, as framed by this Court, are:

¶3    1. Whether the District Court applied the correct standard of proof in this case involving the Indian Child Welfare Act (ICWA).

¶4    2. Whether the District Court's determination that M.R.G. is likely to suffer serious physical or emotional damage if placed in L.G.'s care is supported by evidence beyond a reasonable doubt.

## Factual and Procedural Background

¶5    The Department of Public Health and Human Services (DPHHS) commenced child abuse and neglect proceedings involving the young boy, M.R.G., in July 1998, because of neglect and chemical abuse by both of his parents, as well as domestic violence within the home, including an incident which landed M.R.G.'s father, M.B., in prison for felony partner assault. M.R.G. was born in August 1996 to Native American parents and, by virtue of his father's ancestry, M.R.G. is an enrolled member of the Confederated Tribes of Siletz Indians of Oregon (the Tribe). The Tribe has been actively involved in this case, stipulating to various protective and custodial orders. The Tribe did not oppose termination of either parent's rights and agreed to the long-term placement of M.R.G. with his current foster family.

¶6 M.R.G. is a special needs child. He has Attention Deficit Hyperactivity Disorder and Reactive Attachment Disorder along with learning disabilities. He also has been diagnosed with post-traumatic stress disorder, possibly attributable to his parent's chemical abuse and domestic violence. In addition, M.R.G. has a hearing deficit, is significantly speech impaired, and has problems with his vision.

¶7 M.R.G. has been in foster care almost continuously since July 1998, with the exception of a three-month period when he lived with his mother, L.G., which ended when L.G. became "overwhelmed" and relapsed into chemical abuse. M.R.G.'s foster father, J.M., is Native American. M.R.G.'s foster parents are raising M.R.G. with an understanding of his Native American heritage and culture.

¶8 On October 16, 2000, the State filed for permanent legal custody of M.R.G. and moved to terminate M.B.'s and L.G.'s parental rights. M.B.'s parental rights were terminated at a hearing on April 17, 2002. This Court affirmed the termination of M.B.'s parental rights in *In re M.R.G.*, 2003 MT 60, 314 Mont. 396, 66 P.3d 312.

¶9 Because L.G. had represented that she would relinquish her parental rights if M.B.'s parental rights were terminated, DPHHS did not seek the simultaneous termination of both parents' rights. However, after M.B.'s parental rights were terminated, L.G. decided that she no longer wanted to relinquish her parental rights to M.R.G.

¶10 After several hearings to receive testimony, the District Court heard oral arguments on the matter on July 15, 2003. Thereafter, by order dated July 31, 2003, the District Court terminated L.G.'s parental rights. L.G. appeals.

## Standard of Review

¶11 This Court reviews a district court's decision regarding the termination of parental rights to determine whether the court abused its discretion. *M.R.G.*, ¶ 6 (citing *In re T.C.*, 2001 MT 264, ¶ 13, 307 Mont. 244, ¶ 13, 37 P.3d 70, ¶ 13). In doing so, we review a district court's findings of fact to determine whether they are clearly erroneous and its conclusions of law to determine whether they are correct. *M.R.G.*, ¶ 6. Furthermore, a district court's determinations regarding an expert witness's qualifications and competency are within the discretion of that court and will not be overturned absent a showing of abuse of that discretion. *M.R.G.*, ¶ 6 (citing *In re K.H.*, 1999 MT 128, ¶ 11, 294 Mont. 466, ¶ 11, 981 P.2d 1190, ¶ 11).

## Issue 1.

¶12 *Whether the District Court applied the correct standard of proof in this case involving the Indian Child Welfare Act (ICWA).*

¶13 ICWA (25 U.S.C. §§ 1901, *et seq.*) was enacted by Congress to protect Native American children, their extended families, and the unique cultural heritage of Native American people. The pertinent provision of ICWA at issue here is:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, *supported by evidence beyond a reasonable doubt*, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f) (emphasis added). Furthermore, it has been stated that

> [t]he very use of the "reasonable doubt" standard of proof in ICWA termination actions, the highest standard of proof known to American

4

jurisprudence, was intended by Congress to stop the all-too-common removal of Indian children from their Indian families, and thus tribal culture "by non-tribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing."

*K.H.*, ¶ 20 (quoting *Mississippi Band of Choctaw Indians v. Holyfield* (1989), 490 U.S. 30, 34-35, 109 S.Ct. 1597, 1601, 104 L.Ed.2d 29).

¶14 In the case *sub judice*, L.G. contends that rather than using the beyond-a-reasonable-doubt standard of proof as required by ICWA, the District Court incorrectly used a standard of what was "likely." Contrary to L.G.'s assertions, however, in making its determination that L.G. "would *likely* cause serious emotional or physical damage to [M.R.G. if he] was returned to her," the District Court was mirroring the language of 25 U.S.C. § 1912(f), that

> continued custody of the child by the parent or Indian custodian is *likely* to result in serious emotional or physical damage to the child. [Emphasis added.]

¶15 Furthermore, as the State, acting on behalf of DPHHS, points out in its brief on appeal, 25 U.S.C. § 1912(f), does not require that a state court specifically cite the beyond-a-reasonable-doubt standard of proof. Rather, ICWA requires that a state court's determination be "supported by evidence beyond a reasonable doubt." 25 U.S.C. § 1912(f).

¶16 In *In re M.D.M.*, 2002 MT 305, ¶ 16, 313 Mont. 51, ¶ 16, 59 P.3d 1142, ¶ 16, also an ICWA case, this Court held that "[a]lthough there was no specific finding by the District Court that the burden of proof was met, it is certainly implicit in the court's statements, and to hold otherwise would be to elevate form over substance."

5

¶17    Accordingly, we hold that while the District Court did not specifically state the beyond-a-reasonable-doubt standard of proof in its order, it did apply that standard of proof in this case.

**Issue 2.**

¶18    *Whether the District Court's determination that M.R.G. is likely to suffer serious physical or emotional damage if placed in L.G.'s care is supported by evidence beyond a reasonable doubt.*

¶19    L.G. maintains that ICWA requires that the State produce testimony from a qualified ICWA expert that a continuation of the parental relationship would likely result in serious emotional or physical damage to M.R.G.  L.G. contends that the State failed to present evidence beyond a reasonable doubt that L.G. presented a danger to M.R.G. and that neither ICWA expert testified that M.R.G. would be seriously endangered by L.G.'s conduct if M.R.G. were returned to L.G.'s care.  The State, on the other hand, contends that the District Court received substantial testimony from qualified cultural and other experts upon which it could conclude beyond a reasonable doubt that the prospect of L.G. caring for M.R.G. is likely to subject M.R.G. to serious harm.

¶20    At the various hearings on this matter, the District Court received testimony both favorable and unfavorable to L.G. from various individuals.  As to some of the testimony favorable to L.G., Andree Deligdisch, a clinical social worker employed by the Head Start program, testified that she believed L.G. could successfully parent M.R.G.  Richard Parenteau, a counselor at C.M. Russell High School, testified that L.G. was a regular babysitter for his six-year-old daughter and that L.G. had proved very competent in that

6

substitute parenting role. Bonnie Huestis, a licensed chemical dependency counselor, testified that she had counseled L.G. in regard to the recent deaths of L.G.'s mother and brother and that L.G.'s ability to resist relapsing into substance abuse during that ordeal proved L.G.'s new found stability. Likewise, Diane Geisen, a clinical social worker, testified that L.G. had become proficient at handling circumstances that could easily be overwhelming to others, and thus was more likely to be able to withstand the added stress of parenting M.R.G. In addition, Lee Houle, a licensed chemical dependency counselor, testified that L.G. had a good chance of not relapsing since at the time of the hearing, L.G. had been sober for more than a year. However, Houle also testified that only 15 to 20 percent of people with problems as severe as L.G.'s actually attain sobriety without further relapses.

¶21 On the other hand, Susan Fairhurst, the State social worker on the case through April 2000, testified regarding her concerns that, although L.G. did well in maintaining visits with M.R.G., L.G. had difficulty managing M.R.G.'s behavior, consequently L.G. would become extremely frustrated with M.R.G. Fairhurst also testified that in early 2000, DPHHS was unable to initiate an attempt at family reunification because L.G. was associating with a man who was being investigated regarding sexual molestation allegations. L.G. did not honor DPHHS's request that she keep M.R.G. away from this man who had a history of pedophilia.

¶22 Additionally, one of the goals of L.G.'s treatment plan was that L.G. cooperate fully with DPHHS, however, Fairhurst testified that she was often unable to contact L.G. or to ascertain her whereabouts and that L.G.'s contact with DPHHS was sporadic. Similarly,

7

Kathy No Runner, Fairhurst's replacement, testified that L.G. did not maintain consistent contact with her and that she had great difficulty tracking down L.G. No Runner did testify that L.G. had completed the parenting classes set out in her treatment plan and that, although L.G. failed to show up for several urinalysis tests, those that L.G. did complete during the previous year and a half were negative for traces of alcohol. However, No Runner also testified that she did not know whether L.G. could be a responsible parent because L.G. never maintained a stable or adequate place to live as required by her treatment plan.

¶23 Martina Heavy Runner, the State's ICWA expert, testified that she was concerned about L.G. relapsing back into substance abuse. And, according to Heavy Runner, the bond that foster children develop with their foster families while their parents are trying to recover, should not be overlooked. Heavy Runner testified that, in her opinion, M.R.G.'s physical and emotional condition would be seriously harmed if he were removed from his foster family and placed in L.G.'s primary care because M.R.G. has significantly bonded with his foster family.

¶24 Leslie Murphy, a licensed clinical professional counselor, testified to M.R.G.'s special needs. Murphy, who has treated M.R.G. for several years, also testified to what, in her opinion, would happen if M.R.G. was removed from his foster family:

> [M.R.G.] has done so well and has come so far that I really believe that it would be detrimental. It would be a huge setback for him to go back to his natural biological mother. He feels safe now. He feels secure. He has built up a trust. He has bonded with this family. Like I said, calls them his mom and dad. And I really believe now to pull him out of that environment that took so long . . . to get him to a real good place . . . would be very detrimental to him. I think he would have a lot of setbacks with that. I think it is important he

8

continues with a relationship with his biological mother, that he is able to visit her and see her and have interaction, certainly know who she is . . . but I think to pull him out of an environment he is in right now would be very costly to him in many, many ways.

¶25 In addition, Nancy Reppe, a licensed professional counselor, testified that M.R.G. is defiant and that L.G. cannot control him. She further testified that she "would be apprehensive and concerned" about M.R.G. being returned to the care of L.G. "at this point." Aline James, a family advocate with the Indian child welfare unit of the Tribe, testified that M.R.G.'s current placement in a Native American foster home is appropriate and that L.G.'s parental rights should be terminated.

¶26 Finally, in her closing statement to the District Court, Meghan Lulf, M.R.G.'s attorney, concurred with DPHHS's request for termination of L.G.'s parental rights. Lulf stated that while L.G. should be applauded for addressing her chemical dependency, she's "a day late [and] a dollar short." Lulf further stated that she believed that termination of L.G.'s parental rights were in M.R.G.'s best interests.

¶27 The State points out in its brief on appeal that although L.G. testified that she had been sober in the year preceding the hearings, she conceded that her cycle of dependency has included substantial periods of sobriety followed by relapses, including a recent seven-month period of sobriety. L.G. remarried in April 2003, and she attributed much of her recent success to that marriage. However, L.G.'s husband suffered nearly fatal injuries in an automobile accident which took the lives of L.G.'s mother and brother. At the time of the hearing, L.G., who is unemployed, needed to provide twenty-four-hour care to her disabled

husband who requires a feeding tube. In addition, L.G. acknowledged that M.R.G. has bonded with his foster family and that M.R.G. has stated that he wants to remain with them.

¶28 To forestall termination of parental rights, complete compliance with a treatment plan is required. *In re D.V.*, 2003 MT 160, ¶ 27, 316 Mont. 282, ¶ 27, 70 P.3d 1253, ¶ 27 (citing *In re N.A.*, 2002 MT 303, 313 Mont. 27, 59 P.3d 1135). And, treatment must be successful. Section 41-3-609(1)(f)(i), M.C.A. Nevertheless, ICWA requires that "[a]ny party seeking . . . termination of parental rights . . . shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).

¶29 The record in this case clearly indicates that DPHHS did make active efforts to provide remedial services and rehabilitative programs to prevent the breakup of this family, but that these efforts proved unsuccessful. Following M.R.G.'s removal from his parents' home in 1998, DPHHS provided L.G. with a treatment plan, but L.G. either failed to complete, was slow to complete, or failed to successfully complete her treatment goals. L.G. failed early on to take full advantage of inpatient chemical dependency treatment. At one point, DPHHS returned M.R.G. to L.G.'s care while providing intensive in-home family services, but L.G. relapsed and M.R.G. was removed from the home. A second attempt at reunification with in-home services failed because L.G. was associating with a man under investigation for molesting children. By August 2001, three years after M.R.G.'s removal, L.G. was in jail on multiple DUIs. DPHHS facilitated regular visitation between L.G. and M.R.G. for over five years. Notwithstanding, it took L.G. more than four years to complete the recommended

10

parenting classes; she failed to obtain an alcohol-free and violence-free home for sustained periods of time; and she did not maintain regular contact with her social workers.

¶30 As the State notes in its brief on appeal, L.G. is a good person with serious problems and she needs to be commended for her efforts, but the record does not support her claim that DPHHS is responsible for failing to keep this family together. Furthermore, M.R.G., who is almost eight years old, has been living with his foster family since he was two and a half. In that time, M.R.G. has developed a very strong bond with his foster family. Given L.G.'s history of relapsing into severe alcoholism, M.R.G.'s special needs, and his strong bond with his foster family, M.R.G. could suffer serious emotional damage if he was removed from his foster family and placed in L.G.'s primary care.

¶31 This Court has repeatedly stated that because it does not have "a crystal ball to look into" to determine whether a parent's conduct is likely to change, that determination must, to some extent, be based on the parent's past conduct. *In re G.S.*, 2002 MT 245, ¶ 43, 312 Mont. 108, ¶ 43, 59 P.3d 1063, ¶ 43 (citing *In re E.K.*, 2001 MT 279, ¶ 47, 307 Mont. 328, ¶ 47, 37 P.3d 690, ¶ 47; *In re M.A.E.*, 1999 MT 341, ¶ 37, 297 Mont. 434, ¶ 37, 991 P.2d 972, ¶ 37). Here, the District Court received substantial testimony from qualified cultural and other experts upon which it could conclude beyond a reasonable doubt that the prospect of L.G. providing primary care for M.R.G. is likely to subject M.R.G. to serious harm.

¶32 Accordingly, we hold that the District Court's determination that M.R.G. is likely to suffer serious physical or emotional damage if placed in L.G.'s care is supported by evidence

11

beyond a reasonable doubt and we uphold the District Court's decision to terminate L.G.'s parental rights to M.R.G.

¶33    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER
/S/ JIM RICE