No. 04-211

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 119

IN THE MATTER OF

A.A. and D.A.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Second Judicial District,
                   In and for the County of Silver Bow, Cause Nos. DN 01-28, DN 02-12
                   The Honorable Kurt Krueger, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

           Daniel R. Sweeney, Attorney at Law, Butte, Montana (Attorney for Mother)

      For Respondent:

           Honorable Mike McGrath, Montana Attorney General, Kathleen Jenks, Assistant Attorney General, Missoula, Montana; Robert M. McCarthy, Silver Bow County Attorney, Butte, Montana

Submitted on Briefs:  February 23, 2005

Decided:  May 10, 2005

Filed:

_____
                        Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      K.G., the biological mother of A.A. and D.A., appeals an order of the District Court for the Second Judicial District, Silver Bow County, terminating her parental rights to A.A. and D.A. and awarding permanent custody of the children to the Montana Department of Public Health and Human Services (DPHHS). We affirm.

¶2      We address the following issues on appeal:

¶3      1. Whether K.G. waived her argument that portions of her treatment plans were not appropriate.

¶4      2. Whether substantial compliance with a treatment plan is sufficient to preclude termination of parental rights.

¶5      3. Whether K.G. failed to successfully comply with her treatment plans.

¶6      4. Whether the District Court erred in terminating K.G.'s parental rights.

¶7      5. Whether the District Court's refusal to re-open the termination hearing after K.G. failed to appear was fundamentally unfair.

**Factual and Procedural Background**

¶8      K.G. is the mother of two minor children, D.A., a girl who was born on July 11, 2000, and A.A., a boy who was born on March 19, 2002. At the time of the December 2003 hearing in this matter, K.G. was 22 years old. When she was 16 years old, K.G., who was living in Iowa at the time, entered into a relationship with B.A., the children's father. K.G. and B.A. never married. B.A. was abusive to K.G. and in April 2001, K.G. fled to Butte,

2

Montana, with her daughter and her new boyfriend, S.S. After arriving in Butte, K.G. found employment and left D.A. in the care of S.S. while she was working.

¶9 DPHHS became involved with K.G. in May 2001, when bruising was noted on D.A. and it was determined that D.A. was suffering from shaken baby syndrome. K.G. reported that she had first noticed bruising on D.A. on May 10, 2001, after she left D.A. in the care of S.S. K.G. claimed that when she confronted S.S. about the injuries, he became physically abusive to her. She also claimed that S.S. had been abusive to her before. K.G. did not seek medical attention for D.A. until May 17, 2001. D.A. was removed from K.G.'s care and, on May 21, 2001, DPHHS filed a Petition for Temporary Investigative Authority and Order to Show Cause. The District Court granted emergency protective powers to DPHHS and appointed attorney Timothy Dick (Dick) as D.A.'s guardian ad litem.

¶10 On September 18, 2001, DPHHS filed a Petition for Temporary Legal Custody and Protective Services. The District Court granted the petition following a hearing and D.A. was placed in foster care. The order granting temporary legal custody was appealed to this Court and affirmed in April 2003 in *In re D.A.*, 2003 MT 109, 315 Mont. 340, 68 P.3d 735.

¶11 B.A. followed K.G. to Butte and the two resumed living together. A.A. was born on March 19, 2002, while D.A.'s case was on appeal. Shortly after his birth, A.A. was removed from K.G.'s care and placed in foster care. DPHHS filed a Petition for Emergency Protective Services and Temporary Investigative Authority in A.A.'s case on March 22, 2002.

3

¶12 During her involvement with DPHHS, a number of treatment plans were developed for K.G. with the goal of helping her establish a safe and stable home for the children and eliminating the factors in her life that put her children at risk, such as domestic violence and substance abuse. Initially, treatment plans were developed for both K.G. and B.A., however, B.A. left Montana in June or July 2003, and the subsequent treatment plans concerned only K.G.

¶13 DPHHS ultimately petitioned to terminate B.A.'s and K.G.'s parental rights to both children. A hearing on the petitions to terminate was held in December 2003. K.G. failed to attend the final day of the hearing at which time she was to testify. Thus, on December 23, 2003, her attorney filed a Motion to Reopen for Additional Testimony so that K.G. could testify. The District Court denied the motion stating that any prejudice that may have resulted from K.G. not testifying arose from her failure to appear on the final day of the hearing.

¶14 On January 13, 2004, the District Court issued its Findings of Fact, Conclusions of Law and Order Terminating Parental Rights wherein the court terminated both B.A.'s and K.G.'s parental rights to D.A. and A.A. This appeal involves only the termination of K.G.'s parental rights.

**Standard of Review**

¶15 We review a district court's decision to terminate parental rights to determine whether the district court abused its discretion. *In re D.B.,* 2004 MT 371, ¶ 29, 325 Mont. 13, ¶ 29, 103 P.3d 1026, ¶ 29 (citing *In re N.A.,* 2002 MT 303, ¶ 22, 313 Mont. 27, ¶ 22, 59 P.3d

4

1135, ¶ 22).  The test for an abuse of discretion is whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice.  *D.B.*, ¶ 29 (citing *In re D.V.*, 2003 MT 160, ¶ 14, 316 Mont. 282, ¶ 14, 70 P.3d 1253, ¶ 14).

¶16    In reviewing a district court's decision to terminate parental rights, we determine whether the court's findings of fact supporting termination are clearly erroneous and whether the court's conclusions of law are correct.  *D.B.*, ¶ 30 (citing *In re B.H.*, 2001 MT 288, ¶ 13, 307 Mont. 412, ¶ 13, 37 P.3d 736, ¶ 13; *N.A.*, ¶ 22).  A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if, after reviewing the record, this Court is left with a definite and firm conviction that a mistake has been made.  *D.B.*, ¶ 30 (citing *In re A.C.*, 2001 MT 126, ¶ 20, 305 Mont. 404, ¶ 20, 27 P.3d 960, ¶ 20).

¶17    Moreover, the party seeking to terminate an individual's parental rights has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met.  *In re A.T.*, 2003 MT 154, ¶ 10, 316 Mont. 255, ¶ 10, 70 P.3d 1247, ¶ 10 (citing *In re J.N.*, 1999 MT 64, ¶ 12, 293 Mont. 524, ¶ 12, 977 P.2d 317, ¶ 12).

**Issue 1.**

¶18    *Whether K.G. waived her argument that portions of her treatment plans were not appropriate.*

¶19    K.G. argues that the requirements in her treatment plans that were directed at reducing some of the chaos in her life--i.e., establishing legal ownership of a vehicle, maintaining

employment, and living independently--were not appropriate and should not have been considered in making a decision to terminate her parental rights. DPHHS argues on the other hand that establishing legal ownership of a vehicle was a necessary part of K.G.'s treatment plans because the co-ownership of vehicles with B.A. and S.S. was a form of contention between K.G. and these abusive former partners resulting in violent situations. In addition, DPHHS argues that living independently was also a necessary part of K.G.'s treatment plans because K.G. had a history of involving herself with unstable, abusive relationships.

¶20    "A treatment plan is intended to be a good faith, joint effort by both the [DPHHS] and the parent to preserve the parent-child relationship and the family unit." *A.T.*, ¶ 21 (quoting *Matter of J.S.* (1994), 269 Mont. 170, 178-79, 887 P.2d 719, 724 (Gray, C.J., concurring).

¶21    We stated in *D.B.* that because every situation is unique, we have never established a test to determine what is appropriate with respect to treatment plans in general. *D.B.*, ¶ 44. Instead, we have articulated a number of factors to look to in determining whether a treatment plan is appropriate under the circumstances. Those factors include:  (1) whether the parent was represented by counsel; (2) whether the parent stipulated to the plan, and (3) whether the plan addressed the particular circumstances facing both the parent and the child. *D.B.*, ¶ 44 (citing *Matter of Custody and Parental Rights of M.M.* (1995), 271 Mont. 52, 56-57, 894 P.2d 298, 301).

¶22    In the case *sub judice*, the District Court first ordered K.G. to comply with a treatment plan on August 7, 2001. K.G., who was represented by counsel, agreed to the treatment plan established by DPHHS. The District Court found the terms of the treatment plan to be

6

appropriate. Although K.G.'s counsel filed numerous pleadings, objections, responses, and an appeal to this Court on other grounds, K.G. never objected to the appropriateness of the goals and terms of the treatment plan.

¶23 The District Court approved a second treatment plan for K.G. on June 6, 2002. The court also found that this treatment plan was appropriate for K.G. As with the previous treatment plan, K.G. did not challenge the appropriateness of this plan's terms or goals.

¶24 The District Court approved a third treatment plan for K.G. on January 10, 2003. This treatment plan was approved after the parties filed a stipulation with the court and affirmed their agreement with the treatment plan. K.G. agreed to the treatment plan and participated in its negotiations with the assistance of both her attorney and her therapist. The court found that this treatment plan was reasonable and appropriate. As with the previous treatment plans, K.G. never raised any objection to this plans appropriateness or its terms or goals.

¶25 The District Court approved a fourth treatment plan for K.G. on May 2, 2003. K.G. negotiated this treatment plan with the assistance of her attorneys. As with the previous treatment plans, K.G. agreed to the plan and never raised any objection to the appropriateness of the plan or its terms or goals.

¶26 It is a long held principle that acquiescence in error takes away the right of objecting to it. Section 1-3-207, MCA. We will not put a district court in error for an action to which the appealing party acquiesced or actively participated. *State v. LaDue*, 2001 MT 47, ¶ 23,

304 Mont. 288, ¶ 23, 20 P.3d 775, ¶ 23 (citing *State v. Harris*, 1999 MT 115, ¶ 32, 294 Mont. 397, ¶ 32, 983 P.2d 881, ¶ 32).

¶27     In this case, K.G. was represented by counsel at all stages of this matter, including the negotiation of each treatment plan.  And, K.G., with the advice of counsel, agreed to three of the four treatment plans.

¶28     Accordingly, we hold that K.G. waived her argument that portions of her treatment plans were not appropriate by failing to object to the treatment plans in a timely manner.

**Issue 2.**

¶29     *Whether substantial compliance with a treatment plan is sufficient to preclude termination of parental rights.*

¶30     K.G. maintains that she substantially complied with those requirements in the treatment plans that had a substantial bearing upon her ability to provide a safe and secure home for the children and that her substantial compliance was sufficient to preclude the termination of her parental rights.  We disagree.

¶31     We have repeatedly held that complete compliance with a treatment plan is required, as opposed to partial compliance or even substantial compliance.  *D.V.*, ¶ 27 (citing *N.A.*, ¶ 36).  Moreover, as we noted in *In re A.F.*, 2003 MT 254, ¶ 25, 317 Mont. 367, ¶ 25, 77 P.3d 266, ¶ 25, the relevant statute, § 41-3-609(1)(f)(i), MCA, is written in the disjunctive--a treatment plan has not been complied with *or* has not been successful.

**Issue 3.**

¶32     *Whether K.G. failed to successfully comply with her treatment plans.*

8

¶33    Jennifer Hoerauf (Hoerauf), a DPHHS social worker, testified that K.G. failed to successfully complete any of her treatment plans and that during the period of her last treatment plan, K.G.'s compliance with the plan declined rather than improved.  Hoerauf testified that under her last treatment plan, K.G. only attended four of the nine Al-Anon meetings that were available to her and only five out of the ten women's support group meetings that were available.  In addition, Hoerauf testified that K.G. was supposed to meet weekly with her, but K.G. missed 14 out of the last 18 meetings.

¶34    Jim Dupuis (Dupuis), the supervised visitation specialist, testified that K.G. was originally scheduled for four visits with her children each week, but that was changed because K.G. was not attending the visits on a regular basis.  Dupuis also testified that K.G.'s visitation with her children dropped off beginning in April 2003, and that K.G. only attended 51 of the 93 visit opportunities even though she only lived four blocks from where the visits were conducted.  Along those same lines, Hoerauf testified that because of K.G.'s numerous missed visits, DPHHS had to implement a plan where K.G. was required to call in before a  visit if she planned to attend.  According to Hoerauf, this plan was instituted because it upset the children to be taken to a visit only to have their mother not show up.

¶35    D.A. had been evaluated by several medical professionals since her initial injuries.  These medical professionals reported that D.A. suffered from seizures as a result of shaken baby syndrome.  K.G.'s last two treatment plans required that, after meeting with these medical professionals to identify D.A.'s needs, K.G. was to write a short essay on the course of action she would take if D.A. had a seizure.  In the essay, K.G. was to identify how to

recognize a seizure, the steps to take during the seizure and what to do once the seizure had stopped. Hoerauf testified that K.G. failed to comply with this requirement and that K.G. even stated that she did not believe that D.A. was having seizures.

¶36 One of the goals of K.G.'s treatment plans was to show that she could live independently and not fall back into an abusive relationship that would put her children at risk. In furtherance of that goal, the treatment plans required that K.G. work out a budget and provide the social worker with her receipts and other documentation. Hoerauf testified that K.G. did not comply with this requirement and that K.G. was falling behind in her rent because she was fined for failing to have insurance and registration on her vehicle. Hoerauf also testified that K.G. was jailed at one point for not having proper tags on her vehicle.

¶37 Also in furtherance of the treatment plans' goals that K.G. live independently, K.G. was not to have anyone reside in her home without prior approval of DPHHS. Hoerauf testified that K.G. had several people living with her at various times and at least one of these people had a long criminal history.

¶38 To address K.G.'s co-dependency issues and to help her recognize the risks to her children and herself from associating with persons under the influence of drugs or alcohol, the treatment plans required that K.G. was to maintain a home free of drug and alcohol use and not to associate with individuals who were under the influence of drugs or alcohol. Several law enforcement officers testified at the termination hearing of various incidences involving K.G. where either K.G. or those she was associating with were under the influence of alcohol. In one such instance, officers arrested a man who had stabbed another man as

10

he was leaving K.G.'s apartment. The officers testified that the argument between the two men originated in K.G.'s apartment.

¶39 Based on the foregoing, we hold that K.G. failed to successfully comply with her treatment plans.

**Issue 4.**

¶40 *Whether the District Court erred in terminating K.G.'s parental rights.*

¶41 K.G. contends that DPHHS failed to produce clear and convincing evidence at the termination hearing that she failed to meet the goals of her treatment plans. She maintains that the evidence established that she had complied with the requirements of the treatment plans that had a substantial bearing upon her ability to provide a safe and secure home for the children. She argues that the requirements in the plans that she failed to meet were more directed to reducing the turmoil in her life and that her failure to meet such requirements was not sufficient to terminate her parental rights.

¶42 This Court has stated that a natural parent's right to the care and custody of a child is a fundamental liberty interest which must be protected by fundamentally fair procedures. *A.T.*, ¶ 10. Thus, before terminating an individual's parental rights, a district court must adequately address each applicable statutory requirement. *A.T.,* ¶ 10. In addition, primary consideration must be given to the physical, mental and emotional conditions and needs of the children. Consequently, the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights. *A.F.*, ¶ 13 (citing § 41-3-609(3), MCA).

11

¶43 To terminate a parent-child relationship, a district court must determine that one of the criteria in § 41-3-609, MCA, exists. *D.V.*, ¶ 16 (citing *Matter of M.J.W.*, 1998 MT 142, ¶ 16, 289 Mont. 232, ¶ 16, 961 P.2d 105, ¶ 16). Section 41-3-609, MCA, provides, in relevant part:

(1) The court may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence . . . that any of the following circumstances exist:

. . . .

(f) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care.

¶44 At the time of the termination hearing, D.A. had been in foster care for 32 months and A.A. had been in foster care for 20 months. As discussed in the previous issue, K.G. did not comply with any of her treatment plans during that time. Moreover, several individuals testified that K.G. was no closer to reunification than she had been when she first became involved with DPHHS and that her compliance had actually declined in the months before the termination hearing.

¶45 Since the time that D.A. was first taken into protective custody, K.G. was evaluated twice by Dr. Sarah Baxter (Dr. Baxter), a clinical psychologist. Dr. Baxter testified at the

termination hearing that a major concern regarding the safety of the children was the level of chaos and violence in K.G.'s life. K.G. had a history of involving herself with unstable, abusive relationships and becoming overly dependent on those relationships. While K.G. made some progress in this area, the record indicates that K.G. was still associating with individuals who could put her and her children at risk.

¶46   Dr. Baxter testified that she had concerns about K.G.'s ability to parent the children. Although Dr. Baxter found that K.G.'s interactions with her children were appropriate, nurturing and warm, Dr. Baxter was concerned that K.G. did not believe that D.A. was having seizures as a result of her injuries and that K.G. would not adequately address that problem if the children were returned to her care.

¶47   Furthermore, K.G. regularly missed appointments and visits. Dr. Baxter's second evaluation of K.G. occurred only after Dr. Baxter went to K.G.'s home and got her out of bed after K.G. failed to show up for her appointment. More importantly, Dr. Baxter testified that she was concerned about K.G.'s lack of attendance at visits with her children. During the nine months prior to the termination hearing, K.G. attended only half of the scheduled visits with A.A. and D.A. Dr. Baxter stated that attending visits regularly was extremely important and that missing visits at that rate would create a high level of stress for the children.

¶48   In addition, Jim Dupuis, the supervised visitation specialist, testified that although there had been improvements in K.G.'s parenting ability, he would not be comfortable with

allowing overnight visits for the children with K.G. He also testified that he would not recommend reunification at this time.

¶49 Similarly, the children's guardian ad litem testified that because A.A. had been in foster care all of his life and D.A. had been in foster care since she was ten months old, it was in the children's best interests to get some permanency. Hence, the guardian ad litem recommended that K.G.'s parental rights be terminated.

¶50 Based on a thorough review of the record in this case, we hold that there was sufficient evidence for the District Court to conclude that K.G. had not complied with her treatment plans and that the conduct or condition rendering her unfit was unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. Accordingly, we hold that the District Court did not err in terminating K.G.'s parental rights.

**Issue 5.**

¶51 *Whether the District Court's refusal to re-open the termination hearing after K.G. failed to appear was fundamentally unfair.*

¶52 K.G. appeared at the termination hearing on December 1 and 2, 2003, but failed to appear on December 3, 2003. K.G. argues on appeal that she should have been given the opportunity to testify at trial before her parental rights were terminated and that it was fundamentally unfair for the District Court not to either reopen the case for her testimony or to continue the trial for that purpose. However, the record in this matter clearly demonstrates that K.G. was given the opportunity to testify at the hearing, but she failed to avail herself of that opportunity by failing to show up for the final day of the hearing.

14

¶53    The District Court noted in its Findings of Fact, Conclusions of Law and Order Terminating Parental Rights that on the second day of the hearing, K.G. "covered her face with her hair and held her head in her hands during the testimony of [K.G.'s therapist]" and that K.G. "appeared to be asleep." The court also noted that law enforcement officers attempted to locate K.G. when she did not appear for the third day of the hearing, but they were unable to do so.

¶54    K.G. cites no authority in her appeal brief supporting a requirement that the District Court either re-open testimony or continue a termination hearing indefinitely until the parent makes an appearance. As the State points out in its brief on appeal, in matters involving the lives of children, time is of the essence. While fundamental fairness certainly requires a parent to be notified of the time and location of a hearing, it does not require that the hearing be halted until the parent decides to show up. Here, K.G. was represented by counsel at all stages of the proceedings and she had notice of the petition to terminate as well as notice of the hearing. In fact, when K.G. failed to appear, K.G.'s counsel stated that he was sure that K.G. was aware that the hearing was continuing into the third day because when the hearing adjourned on the second day, K.G. had asked him what time she needed to be there the following morning.

¶55    Furthermore, we agree with the District Court when it stated in its order denying K.G.'s motion to reopen testimony that any prejudice that may have resulted from K.G. not testifying arose from her failure to appear.

¶56    Accordingly, we hold that the District Court's refusal to re-open the termination hearing after K.G. failed to appear was not fundamentally unfair.

¶57    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ JIM RICE
/S/ BRIAN MORRIS