No. 00-641

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 42


IN THE MATTER OF C.B. and J.B.,

Youths in Need of Care.

APPEAL FROM: District Court of the Fifth Judicial District,

In and for the County of Madison,

The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Catherine S. Sands, J. Blaine Anderson, Jr., Attorneys at Law,

Dillon, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Mark Mattioli,

Assistant Attorney General, Helena, Montana

Submitted on Briefs: December 7, 2000
Decided: March 12, 2001

Filed:

_____

Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 The parents of C.B. and J.B. appeal the Findings of Fact, Conclusions of Law and Order issued by the Fifth Judicial District Court, Madison County, terminating their parental rights with respect to J.B. Resolution of the following issue is dispositive of this appeal: whether the District Court erred in determining that the State had demonstrated by clear and convincing evidence that the statutory criteria governing the termination of parental rights were satisfied. We affirm.

BACKGROUND

¶2 On December 10, 1998, the State filed a Petition for Temporary Investigative Authority with regard to C.B. and J.B. Attached to the State's petition was a report generated by Kim K. Miller, a social worker for the Department of Public Health and Human Services ("DPHHS"). Miller stated that DPHHS had become involved with C.B. and J.B.'s family on November 2, 1998, based on a physical abuse referral. This was the third physical abuse referral received by the Madison County DPHHS concerning this family. Miller visited with C.B. (then five years old) at school and discovered numerous bruises on her body. C.B. informed Miller that the bruises were from her half-brother biting her as well as her mother spanking her "really hard" with a belt. An outreach worker from the Strengthening Families Program began visiting with the family in November 1998. The outreach worker informed Miller that on a visit to the family home on December 1, 1998, the home was extremely dirty and that J.B. (a daughter then five months old) was in a baby swing soaking wet from sweat and urine and was very sick with a fever. The District Court granted the State's petition and C.B. and J.B. were removed from the family home.

¶3 The parents entered into a treatment plan on December 28, 1998. The plan required the parents to undergo chemical dependency evaluations and psychological evaluations, participate in counseling and parenting classes, and provide a safe, stable, healthy environment for their children. The court extended temporary custody until May 18, 1999, and again through September 1, 1999. Another treatment plan was filed on June 30, 1999. Its requirements were similar to the previous plan.

¶4 On September 3, 1999, Miller reported that although the parents had begun to comply with their treatment plans, they were still not in full compliance. The children's guardian ad litem also filed a report in which she stated that she was concerned about the cleanliness of the home. She recommended returning J.B. with the understanding that

Family Services would be allowed to visit and would retain the right to remove J.B. at the first sign of a problem. She did not recommend returning C.B. On September 13, 1999, the District Court extended temporary custody of C.B. and J.B. for an additional six months and adopted a Family Preservation Conference Treatment Plan. The court ordered that J.B. begin a schedule of phased-in placement with her parents according to the treatment plan and that C.B. remain in foster care. On October 4, 1999, Miller notified the parents that they were not in compliance with the court-approved treatment plan and informed them that if noncompliance continued DPHHS would seek further relief including termination of parental rights proceedings.

¶5 On December 16, 1999, DPHHS petitioned for permanent legal custody and termination of parental rights. On March 8, 2000, the parties entered into a stipulation agreeing that C.B.'s grandparents be appointed as her legal guardians. Pursuant to this stipulation, the District Court dismissed the State's petition as to C.B. The District Court held a hearing with regard to DPHHS's petition to terminate parental rights with respect to J.B. on March 8 and 13, 2000. On March 30, 2000, the court issued its Findings of Fact, Conclusions of Law and Order terminating parental rights with respect to J.B. The court found that it would not be in J.B.'s best interest to be returned to the family home. The parents appeal.

## STANDARD OF REVIEW

¶6 In reviewing a decision to terminate parental rights, we determine whether the district court's findings of fact supporting termination are clearly erroneous and whether the district court's conclusions of law are correct. *In re B.F.,* 2000 MT 231, ¶ 7, 8 P.3d 790, ¶ 7, 57 St. Rep. 954, ¶ 7. In regard to the statutorily required findings of fact supporting termination, we have stated that a natural parent's right to care and custody of a child is a fundamental liberty interest which must be protected by fundamentally fair procedures and, therefore, the burden is on the party seeking termination to demonstrate by clear and convincing evidence that every requirement set forth in the statute has been satisfied. *In re P.M.,* 1998 MT 264, ¶ 12, 291 Mont. 297, ¶ 12, 967 P.2d 792, ¶ 12.

## DISCUSSION

¶7 Did the District Court err in determining that the State demonstrated by clear and convincing evidence that the statutory criteria governing the termination of parental rights were satisfied?

¶8 Section 41-3-609(1)(f), MCA, provides that a district court may order the termination of the parent-child legal relationship upon a finding that the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

¶9 The parents contend that they substantially complied with the Family Preservation Treatment Plan adopted by court order on September 9, 1999. We believe, however, that there is substantial credible evidence to support the District Court's finding that the treatment plan was neither complied with nor successful. The treatment plan listed four goals: (1) Plan for reunification, (2) Safety plan for the children, (3) Time lines, and (4) Backup plan, concurrent placement. The parents acknowledge that they did not substantially comply with the goal of completing tasks within the time lines established by the plan. For instance, as part of C.B.'s reunification plan, the parents were supposed to meet with Dr. Tim Casey, C.B.'s psychologist, by September 20, 1999. The parents acknowledge that the father did not meet with Casey until November 1, 1999, and the mother did not meet with Casey until January 6, 2000. The mother was to begin individual counseling on October 15, 1999, but did not do so until November 22, 1999. The father was to complete the requirements of a chemical dependency evaluation by September 30, 1999, but did not begin the recommendations until November 22, 1999, and did not complete them until December 15, 1999. Timeliness was material to the successful completion of the treatment plan--not only was timeliness one of the explicitly stated goals of the treatment plan, but DPHHS had also been working with the parents for over a year to get them to complete their treatment plans in order to reunify the family.

¶10 Safety and cleanliness were also goals of the parents' treatment plans. The court found that the condition of the family home was not an environment for a child of J.B.'s age given the fact that the home was "cluttered with soiled laundry, unwashed dishes, excessive (24) beer cans, pornographic materials and dog and cat feces." Photographs submitted by the State at trial support the court's characterization of the condition of the family home.

¶11 Kim Miller, the social worker from DPHHS that was in charge of the family's case,

testified that the parent's compliance with the ongoing treatment plans was nominal and that she did not see any consistent change made for the benefit of the children. Rather, Miller testified that the parents' compliance with the various treatment plans was characterized by a pattern of increasing their efforts as hearings approached and then slipping back into their previous behavior patterns.

¶12 We also believe that there is substantial evidence in the record which supports the District Court's finding that the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. The District Court found that the psychological profile of each parent indicated a lack of ability to provide a safe environment for a young child. The testimony of psychologists, counselors, and social workers involved with this family support this finding. For instance, Dr. Richard W. Thomas, a licensed clinical professional counselor, testified that "[w]e had put a lot of resources into the family with very little change happening." Dr. Thomas testified that he believed his counseling efforts were unsuccessful and that "these folks have not, in good faith, made an effort to be parents or to be husband and wife." Dr. Ned Tranel, a child psychologist who conducted a psychological evaluation of both parents, testified that J. B.'s father lacked "the ability to identify and respond to the emotional state of another person in the absence of verbal cues." Dr. Tranel testified that this inability compromises the father's capacity to nurture, bond, and protect a child.

¶13 The court also stated that "[t]he professionals are in agreement that the return of J.B. to the [family] home would not be in her best interest." This finding is also supported by substantial evidence in the record. For instance, Dr. Thomas recommended that J.B. be put up for adoption because the parents were incapable of sustaining a relationship with each other as husband and wife or as mother and father. Dr. Tranel testified that he did not believe that J.B. would be safe in the care of her parents and he believed it would be in J. B.'s best interest to terminate parental rights because her parents are unable to generate a family environment at a threshold level to allow for the existence of the essential ingredients of child development. Dr. John Cook, a licensed clinical psychologist who performed two evaluations of J.B., testified that J.B. made significant developmental progress while in foster care and developed a strong bond to her foster parents. Dr. Cook testified that the information provided to him indicated that J.B.'s birth parents did not have the skills and abilities to meet the needs of a young child. Dr. Cook also testified that because of J.B.'s strong bond with her foster parents, returning J.B. to her birth parents would be traumatic and detrimental.

¶14 By contrast, the parents refer us to their own testimony as well as the testimony of seven family members and one family friend. The District Court stated that testimony of the parents' family and friend was compromised by their lack of knowledge of the facts which motivated DPHHS's involvement and by the fact of their relationship with the family. A determination as to the credibility to be afforded to evidence is exclusively within the province of the finder of fact and will not be disturbed by this Court on appeal. *State v. Boucher*, 1999 MT 102, ¶ 19, 294 Mont. 296, ¶ 19, 980 P.2d 1058, ¶ 19.

¶15 The parents also refer us to the testimony of two home visitors from the Partnership to Strengthen Families Program ("Program"). Karen Swedman, a home visitor working with the Program, made eight scheduled visits with the family in the fall of 1999. Swedman did not recommend termination of parental rights but rather recommended ongoing treatment plans with visitation between the parents and J.B. in the family home. Swedman also testified that she found 24 cans of beer in the parents' bedroom during one visit and that J.B.'s mother told her that her husband had pushed her head through the parents' bedroom door. Laurie Bartoletti, another home visitor with the Program, made 27 scheduled and unscheduled in-home visits with the family. Bartoletti did not recommend termination of parental rights and stated that she did not believe that returning J.B. to the family home would threaten J.B.'s health or safety. However, Bartoletti also admitted that she had only witnessed J.B. and her father interact on two occasions. Neither Swedman nor Bartoletti were familiar with the psychological evaluations of the parents or the parents' history of domestic violence. The court did not find the testimony of the Strengthening Families visitors credible because it sensed that their recommendations were "based on maternal instinct rather than fact." As stated above, credibility determinations are exclusively within the province of the finder of fact and will not be disturbed on appeal. *See Boucher*, ¶ 19. Furthermore, the fact that the evidence presented in a case conflicts does not automatically preclude a finding that clear and convincing evidence to support a given position exists. *In re J.L.* (1996), 277 Mont. 284, 290, 922 P.2d 459, 462. We conclude that the District Court's findings are adequately supported by the record before us.

¶16 Lastly, the parents contend that the District Court erred in finding that J.B.'s mother had lost custody of another child because of her inability to parent. We agree that there is absolutely no evidence in the record to support this finding. However, as discussed above, there is sufficient evidence to support the termination of parental rights as to J.B. It is well established that "no civil case shall be reversed by reason of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless." *In re A.N.*, 2000 MT 35, ¶ 39, 298 Mont. 237, ¶ 39, 995 P.2d 427, ¶ 39.

¶17 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ TERRY N. TRIEWEILER

/S/ JAMES C. NELSON