No. 01-273

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 288

IN THE MATTER OF B.H. AND D.H., JR.,

Youths in Need of Care.

APPEAL FROM: District Court of the Third Judicial District,

In and for the County of Deer Lodge,

The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Ray J. Dayton, Dayton Law Firm, Anaconda, Montana

For Respondent:

Hon. Mike McGrath, Attorney General; Carol E. Schmidt,

Assistant Attorney General, Helena, Montana

Michael B. Grayson, Deer Lodge County Attorney, Anaconda, Montana

For Children:

Sherry Petrovich Staedler, Attorney at Law, Anaconda, Montana

Submitted on Briefs: October 25, 2001

Decided: December 20, 2001

Filed:

———————————————————————

Clerk


Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 Elva, the mother of B.H. and D.H., Jr. (D.H.), appeals from the Findings of Fact, Conclusions of Law, and Order issued by the Third Judicial District Court, Deer Lodge County, terminating her parental rights with respect to B.H. and D.H. We affirm the judgment of the District Court.

¶2 The following issues are presented on appeal:

¶3 1. Did the District Court err when it found and concluded that Elva's parental rights should be terminated pursuant to § 41-3-609, MCA?

¶4 2. Did the District Court inappropriately rely on the statutory presumption created by § 41-3-604(1), MCA, when it terminated Elva's parental rights?

## FACTUAL BACKGROUND

¶5 Elva is the natural mother of the two children of concern, B.H. and D.H. At the time of the hearing, B.H. was seven years old and D.H. was two years old. The natural father, Delbert, voluntarily relinquished his parental rights to B.H. and D.H. during the District Court proceedings.

¶6 On May 10, 1999, the Anaconda-Deer Lodge County Department of Public Health and Human Services (DPHHS) received a report that D.H., who was approximately four months old at the time, was being fed 2% milk, had an unusual cry and did not appear to be developing appropriately. An effort to investigate the report by two community social workers was met with resistance by Elva, who became belligerent and agitated. She argued that she could do what she wanted to with her baby and that she did not have to talk with the social workers. One of the social workers urged Elva to work with DPHHS and asked that she allow D.H. to be seen by a pediatrician. Eventually, Elva agreed.

¶7 On May 11, 1999, Dr. Wayne Sager, a Butte pediatrician, examined D.H. and found

that he was in the bottom percentile for weight at his age, he lacked normal muscle tone, and he was only at a developmental stage for about half his age. After diagnosing D.H. with severe malnutrition, Dr. Sager recommended that he immediately begin drinking formula. Elva resisted Dr. Sager's recommendation. She argued that 2% milk worked for her and her older child, B.H., and that D.H. had pushed away bottles of formula in the past. Given Elva's response, Dr. Sager recommended that D.H. be placed in foster care so that his recommendation could be implemented. D.H. was placed in foster care that day.

¶8 On May 12, 1999, the District Court determined that both D.H. and B.H. were youths in need of care pursuant to § 71-3-102, MCA, and granted temporary investigative authority to DPHHS. Based on D.H.'s severe malnutrition, D.H. was removed from his parents' care. The District Court again found the children to be youths in need of care on May 26, 1999, and ordered that its May 12, 1999, order remain in full force and effect for ninety days.

¶9 While D.H. was in foster care, Elva, Delbert and B.H. continued to visit. Delbert was angry and belligerent with DPHHS as a result of D.H.'s placement in foster care. At one point, he assaulted the social worker. His visits were cancelled pending his completion of an anger management course. Elva and B.H. continued their visits. On July 6, 1999, the social worker discussed with Elva the need for B.H. to have a speech evaluation. On her next visit with D.H., Elva failed to bring B.H. along. She stated that she did not know where B.H. was and that Delbert had met with friends and took B.H. for an unspecified period of time. Two weeks later, Elva told the social worker that she had received a phone call from Delbert, and that Delbert and B.H. were in New York. The social worker told Elva that visitation with D.H. would cease until she cooperated with DPHHS to locate and return B.H. to Anaconda.

¶10 On August 3, 1999, the District Court ordered Elva to show cause for her failure to make B.H. available for a speech evaluation. At the August 11, 1999, show cause hearing, Elva informed the District Court that B.H. was sent to Glasgow with Delbert to ensure that DPHHS would not remove B.H. from their custody. On that same day, DPHHS filed a petition for temporary legal custody for both B.H. and D.H. On September 1, 1999, the District Court granted DPHHS' petition. The District Court ordered B.H. be returned to DPHHS by September 2, 1999, so that she could be placed in foster care within two weeks, ordered DPHHS to present a treatment plan for the parents within thirty days, and ordered DPHHS to prepare a report of its investigation and make a recommendation for disposition by February 1, 2000. B.H. was placed in foster care on September 4, 1999. A

treatment plan for Elva was approved by the Court on November 10, 1999. The treatment plan required that Elva attend parenting classes, undergo psychological and chemical evaluations, and meet with a social worker on a regular basis. Elizabeth Hill was assigned as the case social worker. The District Court subsequently granted an extension of the State's temporary legal custody on March 15, 2000.

¶11 On September 13, 2000, DPHHS petitioned for the termination of Elva and Delbert's parental rights. The District Court held a hearing on the matter on December 13, 2000. It was at that time that Delbert voluntarily relinquished his parental rights and transferred permanent legal custody of B.H. and D.H. to DPHHS. At the time of the hearing, D.H. had been in foster care for approximately twenty months and B.H. had been in foster care for approximately sixteen months.

¶12 On February 14, 2001, the District Court issued its Findings of Fact and Conclusions of Law, and ordered that the parent-child relationship between Elva and her children be terminated. Elva filed a Notice of Appeal on March 12, 2001.

## STANDARD OF REVIEW

¶13 On review of a decision to terminate parental rights, we determine whether the district court's findings of fact supporting termination are clearly erroneous and whether the district court's conclusions of law are correct. *In re C.B.*, 2001 MT 42, ¶ 6, 304 Mont. 252, ¶ 6, 20 P.3d 117, ¶ 6. Findings of fact are clearly erroneous if they are not supported by substantial evidence, the court misapprehended the effect of the evidence, or this Court's review of the record persuades it that a mistake has been made. *In re T.B.*, 1999 MT 174, ¶ 12, 295 Mont. 234, ¶ 12, 983 P.2d 929, ¶ 12. Additionally, courts must, when considering the criteria for termination of parental rights, give primary consideration to the best interests of the child as demonstrated by the child's physical, mental, and emotional needs. *In re J.N.*, 1999 MT 64, ¶ 13, 293 Mont. 524, ¶ 13, 977 P.2d 317, ¶ 13.

## DISCUSSION

## ISSUE 1

¶14 Did the District Court err when it found and concluded that Elva's parental rights should be terminated pursuant to § 41-3-609, MCA?

¶15 The criteria for termination of parental rights is set forth at § 41-3-609, MCA. Of the six possible scenarios which allow for termination, § 41-3-609(f), MCA, applies to this case, and provides in pertinent part:

> **Criteria for termination.** (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
>
> . . .
>
> (f) the child is an adjudicated youth in need of care and both of the following exist:
>
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
>
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

¶16 The party seeking termination of an individual's parental rights has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met. *J.N.*, ¶ 12. In the context of parental rights cases, we have defined clear and convincing evidence as:

> simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of the proof. This requirement does not call for unanswerable or conclusive evidence.

*Matter of J.L. (1996), 277 Mont. 284, 289, 922 P.2d 459, 462 (quoting In re Interest of S.M.Q. (Kan. 1990), 796 P.2d 543, 545).*

¶17 Therefore, to terminate Elva's parental rights to B.H. and D.H., the District Court had to find that clear and convincing evidence existed to show that: (1) B.H. and D.H. were adjudicated youths in need of care; (2) an appropriate treatment plan had been approved for Elva and either had not been complied with or had not been successful; and (3) the conduct or condition rendering Elva unfit to parent was unlikely to change within a reasonable time period.

¶18 The District Court's findings that B.H. and D.H. were youths in need of care and that

an appropriate treatment plan had been approved for Elva are undisputed. The question before us is whether clear and convincing evidence existed for the Court's finding that (1) Elva's treatment plan was unsuccessful and (2) that her conduct or condition rendering her unfit to parent was unlikely to change within a reasonable time period. Elva contends that the District Court incorrectly relied upon the testimony and conclusions of two psychologists, Dr. Tim Casey and Dr. Tranel, in making that determination.

¶19 From the testimony of all of the experts at the hearing, including but not limited to or dependent upon Dr. Casey and Dr. Tranel, the District Court found there was clear and convincing evidence to support termination pursuant to § 41-3-609, MCA. For the following reasons, we affirm the District Court.

¶20 Before discussing the testimonies of Dr. Casey and Dr. Tranel, we find it important to note that several other experts provided relevant testimony to questions before the Court. With respect to whether Elva successfully completed her treatment plan, Elizabeth Hill, the case social worker, testified that, in her opinion, Elva had not successfully completed her treatment plan in that she failed to effectively incorporate the learned parenting skills into her daily life on a consistent basis.

> Q: [S]he did superficially comply (with the treatment plan) and go where you told her to go, is that true?
>
> A: Yes.
>
> Q: Do you think she successfully completed the treatment plan?
>
> A: No.
>
> Q: Or that she was successful and got the skills out of going to the things that she was suppose to get?
>
> A: No.

Based upon her sixteen months of work with Elva and Delbert, Hill recommended the termination of Elva's parental rights. Terri Waldorf, the social work supervisor at DPHHS who assumed responsibility for the case in September of 2000, agreed with Hill's testimony. Waldorf testified that she believed that it was in the best interests of the children to terminate Elva's parental rights. The testimonies of Hill and Waldorf provided

the District Court with clear and convincing evidence, apart from the testimonies of Dr. Casey and Dr. Tranel, that Elva had not successfully completed her treatment plan.

¶21 In Conclusion No. 4, the District Court noted that the testimonies of Dr. Casey and Dr. Tranel were particularly important to the question of whether the conduct or condition rendering Elva unfit to parent was unlikely to change within a reasonable time. Dr. Casey evaluated Elva in August and September of 1999, approximately fifteen months prior to the termination hearing. Dr. Tranel performed his evaluation in April, about eight months before the hearing. Elva contends that Dr. Casey and Dr. Tranel conducted their psychological evaluations too far in advance of the December 2000 hearing to be able to determine whether the conduct rendering her unfit to parent was unlikely to change. Both evaluations occurred prior to Elva's participation in parenting classes.

¶22 However, after review of the psychologists' testimonies, it is clear that their conclusions were relevant to the question before the Court regardless of Elva's subsequent participation in parenting classes. Dr. Casey found that Elva had below average intelligence which raised questions about her ability to function. More importantly, Dr. Casey diagnosed Elva with an "Axis II" personality disorder based on her inability to learn from experience. Axis II personality disorders are long-standing, maladaptive patterns of behavior, which are not easily corrected in a reasonable period of time. In Dr. Casey's opinion, as a result of her personality disorder, Elva was incapable of parenting without direct twenty-four hour supervision from a responsible party.

¶23 Dr. Tranel similarly provided useful information to support the District Court's conclusion. Dr. Tranel concluded that Elva had two significantly handicapping conditions which would prevent her from providing a minimal or threshold level of parenting for B. H. and D.H. First, Elva tested marginally for general aptitude, where her test scores indicated a sixth grade level in reading, spelling, and arithmetic. While acknowledging that a lower intelligence level is not a bar to being an effective parent, Dr. Tranel opined that her lower aptitude level "makes it extremely difficult for her to benefit from training opportunities, parent training exposure or other didactic interventions that might help her elevate her level of functioning." Second, Dr. Tranel similarly diagnosed Elva with a personality disorder, and when asked what impact that may have, Dr. Tranel responded as follows:

> Well, a personality disorder by definition is a long-standing maladaptive or dysfunctional style of living or pattern of behaving in social situations. It's important

because her style of living is not adaptive to the demands of parenting or even to the demands of age appropriate vocational functioning. She mis-reads [sic] circumstances in her life. She's not reflective and has difficulty learning from experience, and meanders through life repeating the same dysfunctional behaviors but never really improving or changing her lifestyle.

¶24 Therefore, in Dr. Tranel's opinion, attendance at parenting classes would not have had a major impact on Elva's ability to make the changes necessary to effectively parent within a reasonable time. Because of her two handicapping conditions, Dr. Tranel believed Elva did not have sufficient skills to successfully parent and could not develop those skills in a reasonable time period.

¶25 Taken as a whole, the record demonstrates clear and convincing evidence that Elva had not successfully completed her treatment plan and that the condition rendering her unfit to parent would not change within the foreseeable future. Accordingly, the District Court properly found and concluded that the statutory criteria had been met.

## ISSUE 2

¶26 2. Did the District Court inappropriately rely on the statutory presumption created by § 41-3-604(1), MCA, when it terminated Elva's parental rights?

¶27 Elva contends that the District Court inappropriately relied on the statutory presumption created by § 41-3-604(1), MCA, contrary to the statutory requirements in § 41-3-609, MCA.

¶28 Section § 41-3-604(1), MCA, provides in pertinent part:

**When petition to terminate parental rights required.** (1) If a child has been in foster care under the custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights.

Because both B.H. and D.H. had been in foster care for more than 15 of the most recent 22 months, the presumption was applicable to this case.

¶29 We agree that the presumption in § 41-3-604(1), MCA, neither eliminates the substantive requirements of § 41-3-609, MCA, nor diminishes the clear and convincing burden of proof on the party seeking termination of parental rights. However, in this case,

the record is clear that the District Court both acknowledged the presence of the presumption given the facts of this case *and* considered the criteria required for termination in § 41-3-609, MCA, as discussed above. Accordingly, we conclude that the District Court did not err.

¶30 For these reasons, the judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ PATRICIA COTTER

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ JIM RICE