No. 04-288

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 371

IN THE MATTER OF
D.B., J.D., S.B., J.B., and L.B.,

     Youths In Need Of Care.

APPEAL FROM:    The District Court of the Sixteenth Judicial District,
In and For the County of Custer, Cause No. DN 2001-9,
Honorable Gary L. Day, Presiding Judge

COUNSEL OF RECORD:

     For Appellants:

          J. Dennis Corbin, Attorney at Law, Miles City, Montana (Father)

          Ali Moulton, Attorney at Law, Glendive, Montana (Mother)

     For Respondent:

          Honorable Mike McGrath, Attorney General; Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

          Garry P. Bunke, County Attorney; Paul Emerson, Deputy County
Attorney, Miles City, Montana

          Judy A. Williams, Assistant Attorney General, Child Protection Unit,
Billings, Montana

          Janette Krutzfeldt Jones, Krutzfeldt & Jones, Miles City, Montana
(Guardian Ad Litem)

Submitted on Briefs:  November 18, 2004

Decided:   December 22, 2004

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Father S.B. (Father) and mother L.D. (Mother) appeal from the District Court's termination of the parenting rights of their five children, D.B. (Oldest Daughter), J.D. (Oldest Son), S.B.[1] (Youngest Son), J.B. (Middle Daughter), and L.B. (Youngest Daughter). We affirm the District Court.

## BACKGROUND

¶2     Father and Mother had five children together. Oldest Daughter was born in March 1997, and is 13 months older than Oldest Son, who is 14 months older than Youngest Son, who is 18 months older than Middle Daughter, who is 16 months older than Youngest Daughter.

¶3     In July 2001, Oldest Daughter complained to her mother about pain in her perineal area. Mother took her to the clinic the next day. Dr. James Young saw red sores and reported the situation to the Department of Public Health and Human Services (the Department) and referred Oldest Daughter to an obstetrician gynecologist, Dr. J. Randall Rauh. Dr. Rauh determined that accidental straddling, assault, or self-inflicted blunt trauma could have caused the injuries, but that it was most likely caused by assault.

¶4     Beyond the perineal sores, Dr. Rauh discovered an older anal scar and found he could very easily put his thumb into Oldest Daughter's rectum, which implies that things at least as large as his thumb had already been inserted. Father and Mother argued that was the

---

[1] For reference's sake, please note that Father happens to have the same initials as Youngest Son.

result of severe constipation, but Dr. Rauh believed that an external force must have caused the trauma. Finally, Dr. Young also found finger-shaped bruises on Oldest Daughter's back. By the end of July 2001, the District Court had issued an order granting temporary investigative authority (TIA) and protective services for all the children.

¶5    Almost two years passed during which everyone involved–except the parents–believed parental sexual misconduct caused the sores on Oldest Daughter. In May 2002, both Father and Mother were criminally charged with abuse and neglect of their children. Father stayed in jail for a year. By May 16, 2003, after subsequent observations of the same sores and consultation with Dr. Stephen Guertin from Lansing, Michigan, Dr. Rauh diagnosed Oldest Daughter with a rare skin disease called lichens sclerosis et atrophicus (LSA).

¶6    The LSA made Oldest Daughter's perineal area itch, and she scratched it. The results of LSA resemble the evidence of sexual abuse, but the origin of the disease is unknown. With a new, clear, alternate explanation, the State dropped the charges against Father and released him in May 2003. The District Court, in this case, specifically ruled that it would disregard prior testimony and exhibits related to *physical* findings previously believed to be evidence of sexual abuse of Oldest Daughter.

¶7    Dr. Young testified that, as early as January 2001, he had ongoing concerns about the development of the other children because Oldest Son and Youngest Son appeared seriously delayed in their speech. In January 2001, he had suggested the parents take the children to the Developmental Educational Assistance Program (DEAP) for speech evaluations;

3

however, the Father opposed the evaluations. Only after the Department placed the children in foster care did DEAP have an opportunity to evaluate the children.

¶8 Those evaluations revealed that Oldest Daughter was sixteen months, or 30 percent, behind in development; Oldest Son was eleven months, or 27 percent, behind; and Youngest Son was six months, or 22 percent, behind. The children began progressing quickly in their development after living in foster care. Oldest Son progressed from having nearly no understandable speech to carrying on conversations. Dr. Young testified that the improvement was attributable to therapy and not just the passage of time.

¶9 In October 2001, Dr. F. Tom Peterson completed psychological evaluations on both parents with special attention to parental competence. The court ordered Dr. Peterson to consider historical documents including Father's unsubstantiated child neglect history from California involving a 1997 allegation of neglect of Oldest Daughter and a 1990 conviction for exhibiting a firearm. Dr. Peterson found the Mother was "pollyannish" and avoided problems including those that resulted in the Department taking her children away. Later, Alicia Brewer, a licensed clinical professional counselor, diagnosed Mother with most characteristics of Schizoid Personality Disorder and many characteristics of Dependent Personality Disorder. Dr. Peterson concluded Father was suffering from Paranoid Personality Disorder with features of narcissism and antisocial orientation. Father does not know his children's birth dates.

¶10 The District Court approved two treatment plans for each parent. Mother's treatment plan ran from March 2002 to August 2002, and January 2003 through the remainder of the

4

case. Father's treatment plans ran from May 2002 to August 2002 and January 2003 through the remainder of the case. Both parents' second plans specifically provided, "This agreement will remain in effect until approval of a subsequent plan . . . ." The District Court found that neither parent completed either treatment plan.

¶11   The Mother's first treatment plan required twelve tasks of her. *Inter alia*, she had to undergo a psycho-sexual evaluation by Michael Sullivan and follow through with his recommendations, engage in therapy exploring parent-child and marital dynamics, and participate in a program with a professional to develop an understanding of her children's developmental needs. Her second treatment plan required her, in addition to the first twelve tasks, to address her previous involvement with Child Protective Services in Montana and California and receive treatment for her past sexual abuse victimization.

¶12   The District Court found that Mother failed to follow the recommendations Michael Sullivan made in his psycho-sexual evaluation, to address successfully the risk factors identified by Michael Sullivan in the psycho-sexual evaluation, to complete therapy, to complete a program with a professional to help her understand her children's developmental and safety needs, to discuss her children's developmental and safety needs as they relate to the professional's material, to attend marital counseling, to address previous involvement with California and Montana child protection services, and to address her personality disorder.

¶13   Ms. Brewer, Mother's therapist, testified that Mother was open to working on the treatment plan, invested in therapy, seemed cooperative, made progress in her assertiveness

5

and interpersonal skills, and did even more than Brewer asked. Mother kept her appointments every week or every other week from February 2002 to May 2003. Mother worked with Earl Brewer at DEAP twenty to twenty-five times from September 2002 to April 2003, and he testified she was interested, engaged, and understanding the information.

¶14    The District Court found that therapy was not a priority for Mother. Ms. Brewer believed that Father's return home in May 2003, after his incarceration, caused Mother to fall back into her former patterns of doing what he wanted because it was easy and comfortable for her. After assessing Mr. Brewer's testimony, the District Court found that, while Mother completed some book work and intellectually understood the developmental and safety needs of the children, she was unwilling or unable to personalize the material to her own situation.

¶15    Both of Father's treatment plans required twelve tasks of him, but the District Court was unsure whether Father was advised of the last eight tasks of the second plan. Three of the first four tasks–present in both treatment plans–required Father to obtain a chemical dependency evaluation and follow through with all the recommendations of the chemical dependency counselor, obtain a psychiatric evaluation and follow through with all the recommendations of the psychiatrist, and obtain a complete psycho-sexual evaluation with Michael Sullivan and follow through with his recommendations.

¶16    Father failed to obtain any evaluations. The District Court found that Father had not completed any of these three tasks despite having the opportunity. Since he did not complete

6

any evaluation before he was jailed or in the six months after his incarceration, he, of course, could not have completed any of the respective recommendations.

¶17 Mother raises the following issues:

¶18 1. Whether the District Court erred by denying the motion to dismiss the petition to terminate parental rights based on the discovery of newly-acquired evidence that significantly undermined the validity of the prerequisite adjudication of the children as youths in need of care.

¶19 2. Whether the Department had probable cause to grant a TIA on the allegation of failure to educate the children for failing to address developmental needs though provided the opportunity.

¶20 3. Whether the District Court erred in allowing the Department to provide Dr. Peterson with historical documents and information.

¶21 4. Whether Mother's treatment plans were inappropriate because the Department drafted them for a sexual offender based upon the allegations of sexual abuse when it should have focused on correcting the children's alleged developmental delays.

¶22 5. Whether the District Court erred in determining that Mother was unsuccessful or noncompliant with her treatment plan.

¶23 6. Whether the District Court erred in determining that the conduct or condition rendering Mother unfit was unlikely to change within a reasonable amount of time.

¶24 Father raises the following issues:

¶25    1. Whether the District Court erred by denying the motion to dismiss the petition to terminate parental rights based on the discovery of newly-acquired evidence that significantly undermined the validity of the prerequisite adjudication of the children as youths in need of care.

¶26    2. Whether Father's treatment plans were inappropriate because he was incarcerated during much of the two treatment plans and the District Court did not tailor those plans to fit a father in incarceration.

¶27    3. Whether the District Court abused its discretion in finding Father failed to complete his treatment plan successfully.

¶28    4. Whether the District Court erred in determining that the conduct or condition rendering Father unfit was unlikely to change within a reasonable amount of time.

**STANDARD OF REVIEW**

¶29    This Court reviews a District Court's decision to terminate parental rights to determine whether the District Court abused its discretion. *In re N.A.*, 2002 MT 303, ¶ 22, 313 Mont. 27, ¶ 22, 59 P.3d 1135, ¶ 22.  A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or exceeding the bounds of reason resulting in substantial injustice. *In re D.V.*, 2003 MT 160, ¶ 14, 316 Mont. 282, ¶ 14, 70 P.3d 1253, ¶ 14.

¶30    This Court reviews the District Court's findings of fact supporting termination to determine whether they are clearly erroneous. *In re B.H.*, 2001 MT 288, ¶ 13, 307 Mont. 412, ¶ 13, 37 P.3d 736, ¶ 13.  Those facts will be clearly erroneous (1) when substantial

8

evidence fails to support the district court's finding; (2) when the district court misapprehended the effect of the evidence; or (3) when, after reviewing the record, this Court has a definite and firm conviction that the district court made a mistake. *In the Matter of A.C.*, 2001 MT 126, ¶ 20, 305 Mont. 404, ¶ 20, 27 P.3d 960, ¶ 20. In reviewing a district court's conclusions of law, we determine whether they are correct. *N.A.*, ¶ 22.

## MOTHER'S ISSUE 1 AND FATHER'S ISSUE 1

¶31 Father and Mother each argue that the District Court erred by denying their motions to dismiss the petition to terminate parental rights based on the discovery of newly acquired evidence that significantly undermined the validity of the prerequisite adjudication of the children as youths in need of care. They argue that, absent the sexual molestation allegations from the LSA mis-diagnosis, the District Court could not have designated the children youths in need of care. The District Court terminated the parent-child relationships pursuant to § 41-3-609, MCA (2001), that provides, in relevant part, as follows:

> (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
> . . .
> (f) the child is an adjudicated youth in need of care and both of the following exist:
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

If the District Court erred in adjudicating the children as youths in need of care, the subsequent termination is legally invalid. The parents further argue that the allegations of sexual molestation due to the LSA mis-diagnosis tainted the entire proceedings to such a

9

tremendous degree that they deprived Mother of her rights to due process and fundamental fairness.

¶32 We conclude the District Court had adequate grounds independent of the LSA misdiagnosis for adjudicating these children youths in need of care. Pursuant to § 41-3-422(5)(a)(ii), MCA (2001), the District Court used the preponderance of the evidence standard for the adjudication as youths in need of care. The children suffered from severe language delays that required significant intervention, and the parents had psychological conditions affecting their parenting abilities. Three of the children were as much as 30 percent delayed. Father had Paranoid Personality Disorder with features of narcissism and antisocial orientation, and Mother poses an indirect threat to her children because she avoids issues surrounding the children's removal and exhibits denial of any problems with child-rearing.

¶33 Even if the physical evidence attributable to LSA had not been introduced at the time of the adjudicatory hearing, there was substantial evidence supporting the District Court's designation. Any taint attributable to the LSA has not pervaded this case to violate fundamental fairness. The developmental delays and psychological disorders–independent of the sexual molestation allegations–support the District Court's finding by a preponderance of evidence that these children were youths in need of care.

**MOTHER'S ISSUE 2**

¶34 Mother argues that the District Court would not have had probable cause to order the TIA based on the allegation that she failed to address developmental needs. Without that

10

probable cause, the argument goes, the Department could never have taken the children away, and Mother would have had the opportunity to correct the developmental deficiencies.

¶35 The circumstances need only rise to the level of probable cause for a district court to issue an order for a TIA. Section 41-3-422(5)(a)(i), MCA (2001). Subsequent discovery that the initial probable cause determination was based on faulty information does not change the fact that the district court initially had probable cause based upon information available at the time of the determination. With such a difficult disease to detect as LSA, neither Dr. Young nor Dr. Rauh acted unreasonably in making referrals to the Department. At the time of the TIA hearing, the District Court had evidence of sores, anal scarring, and bruises in Oldest Daughter's perineal area. Dr. Rauh testified that constipation and straddling were unlikely to have caused those injuries. Substantial, credible evidence supported the District Court's finding of probable cause for issuing the TIA.

## MOTHER'S ISSUE 3

¶36 The District Court ordered Dr. Peterson to take into account the alleged child abuse that took place in California when he made his psychological evaluations. Mother contends that the Department should not have sought and acquired the unsubstantiated California reports from 1990 to 1997. Montana statutes require the Department to destroy non-medical, unsubstantiated records after three years. Section 41-3-202(5)(c)(i)(A) to (B), MCA (2003). By seeking out those California reports and transferring them to Dr. Peterson, Mother asserts the Department violated the spirit of that Montana statute and prejudiced Dr. Peterson's evaluation of Mother.

11

¶37    Section 41-3-202(5)(c), MCA (2003), was enacted in 2003–after the commencement of this action and after the District Court's decision that Dr. Peterson should consider the California history.  Act approved Apr. 17, 2003, ch. 406, 2003 Mont. Laws 1489.  Without legislative intent, statutes do not apply retroactively, so this 2003 statute did not apply to the District Court's 2001 decision.  Section 1-2-109, MCA (2001) ("No law contained in any of the statutes of Montana is retroactive unless expressly so declared."); *Porter v. Galarneau* (1996), 275 Mont. 174, 185, 911 P.2d 1143, 1150.  Thus, the District Court did not err by requiring Dr. Peterson to consider unsubstantiated allegations from California.

¶38    Second, Mother argues that, included in the "Documents Accompanying the Referral" that Dr. Peterson received, was a reference to Father's alleged history of violence in California.  Mother cites three cases that she contends, together, stand for the proposition that a district court can consider only violence of the parent who is subject to the inquiry or violence of a spouse or intimate partner committed during the course of the relationship with the parent who is the subject of the inquiry:  *In re M.T.*, 2002 MT 174, 310 Mont. 506, 51 P.3d 1141 (admitting evidence of violence between the mother and her husband); *In Re M.F.B.*, 2001 MT 136, 305 Mont. 481, 29 P.3d 480 (admitting evidence of violence among the mother, father, and children); and *In re A.W.* (1991), 247 Mont. 268, 806 P.2d 520 (admitting evidence of violence by the mother's boyfriend and the father of one of her children).  Mother argues that, because she was neither dating nor married to Father at the time of the alleged violence, Dr. Peterson should not have considered Father's alleged violent history in evaluating Mother.

12

¶39 Mother has committed the Converse Fallacy of Accident or Hasty Generalization. Ruggero J. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 191-92 (1989). Contrary to Mother's characterization, the three cases she cites stand for the proposition that the district court can *include* evidence of violence of the parent or the parent's spouse or intimate partner. Father was, at the time of the events, neither Mother's spouse nor her intimate partner. Thus, she reasons, the District Court cannot include that evidence. Choosing to admit some evidence does not imply a choice to exclude other, related evidence. Just because Tom is a man and Joe is a man, that does not imply that, because Dave is neither Tom nor Joe, Dave is not a man. These cases do not require a district court to *exclude* any evidence if that evidence is relevant. If the evidence is admissible in court, *a fortiori,* the psychologist can admit it into his own evaluation.

## MOTHER'S ISSUES 4 & 5

¶40 First, Mother contests the District Court's findings of fact that she failed to complete her treatment plan. Mother argues that keeping her appointments every week or every other week from February 2002 to May 2003, investing herself in therapy, cooperating with Ms. Brewer, making progress in her assertiveness and interpersonal skills, and doing even more than Brewer asked, together, constitute successful completion of therapy. Concerning her failure to complete a program to understand the children's developmental and safety needs, Mother argues that working with Mr. Brewer twenty to twenty-five times from September 2002 to April 2003 and maintaining interest, engagement, and understanding the information constitutes completion of that task.

13

¶41 A parent must completely comply with a treatment plan; partial compliance or even substantial compliance is insufficient. *In re D.V.*, 2003 MT 160, ¶ 27, 316 Mont. 282, ¶ 27, 70 P.3d 1253, ¶ 27. After assessing Ms. Brewer's testimony, the District Court found that Mother had been making progress until May 2003. After that, her attendance at and scheduling of counseling appointments deteriorated.

¶42 Therapy was not a priority for Mother. Father's return to the home after his incarceration caused Mother to fall back into her former dependent patterns despite many months' work. Mother was going through the motions by completing the book work and intellectually understanding Mr. Brewer's lessons, but she refused to internalize the lessons and apply them to her own situation.

¶43 The Legislature did not intend, and the Department does not include, therapy tasks in treatment plans as exercises in futility. If the Department wanted Mother to learn self-discipline by requiring her to show up at certain times and read certain books, it could use other treatment plan tasks. Mother needs to do more than just go through the motions. The Department wanted Mother to better parent her children by learning new techniques *and* by applying those techniques to her situation. New techniques will not change the situation unless they are put into practice.

¶44 Second, Mother argues that the treatment plans were inappropriate under § 41-3-609(1)(f)(i), MCA (2001), because the Department drafted them for a sexual offender based upon the allegations of sexual abuse when it should have focused on correcting the children's alleged developmental delays. Because every situation is unique, this Court has never

14

established a test to determine what is "appropriate" with respect to treatment plans in general. Instead, we have articulated a number of factors by which to determine whether a treatment plan is appropriate under the circumstances, including (1) whether counsel represented the client, (2) whether the parent stipulated to the plan, and (3) whether the plan addresses the particular circumstances facing both the parent and the child. *In re the Custody and Parental Rights of M.M.* (1995), 271 Mont. 52, 56-57, 894 P.2d 298, 301.

¶45    Counsel represented Mother, and she stipulated to the plan, so the only remaining question is whether the sexual abuse was a particular circumstance facing both the parent and the child. For Mother, the LSA mis-diagnosis changed the assumptions on which the Department based her treatment plans. If a treatment plan contains both appropriate and inappropriate tasks, the parent need not complete the inappropriate tasks and the district court cannot consider that failure in its determination whether to terminate parental rights. *In re A.N.*, 2000 MT 35, ¶¶ 36-41, 298 Mont. 237, ¶¶ 36-41, 995 P.2d 427, ¶¶ 36-41.

¶46    Assuming, *arguendo*, that the treatment plan tasks related to sexual abuse were inappropriate, and excluding those tasks, the District Court, nevertheless, had substantial, credible evidence supporting its finding by clear and convincing evidence that Mother did not complete her treatment plan. Since the inclusion of the inappropriate sexual abuse treatment plan elements constitutes harmless error, the District Court did not clearly err in determining that Mother had failed to complete her treatment plan.

**MOTHER'S ISSUE 6**

¶47 Mother argues that the District Court erred in determining that the conduct or condition rendering Mother unfit was unlikely to change within a reasonable amount of time. Mr. Brewer worked weekly with Mother, who was interested in the material, engaged in it, and appeared to understand what was being discussed. She argues that, if she did not successfully complete her treatment plans, she completed most of her treatment plan tasks and successfully completed working with the counselor regarding her own sexual abuse victimization. Thus, no evidence supports a finding that Mother will continue abusing or neglecting her children.

¶48 The District Court terminated parental custody under § 41-3-609(1)(a)(f), MCA (2001). Subsection (ii) requires the District Court to find that "the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." Section 41-3-609(2), MCA (2001), clarifies the meaning of "unlikely to change within a reasonable time":

> (2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:
> (a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;
> . . . .

16

"[W]e do not have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct." *In re C.A.R.* (1984), 214 Mont. 174, 187, 693 P.2d 1214, 1221.

¶49    Dr. Peterson found that Mother had a "pollyannish" personality disorder that caused her to avoid problems, and Ms. Brewer diagnosed her with many elements of both Schizoid Personality Disorder and Dependent Personality Disorder.  Mother's avoidance of problems combined with her refusal to apply the lessons to her children suggest that she has never acknowledged doing anything wrong.  Without accepting responsibility, she will not change her behavior.  Under the same conditions, the children's recent developmental advances will arrest.

¶50    The gains that Mother made during the periods she participated in the treatment objectives were insufficient to enable her to parent her children adequately.  Her mental illnesses are sufficient in number, degree of severity, and effect on the children's welfare to support the District Court's conclusion that she was unlikely to change within a reasonable amount of time.

### FATHER'S ISSUE 2

¶51    Father argues that his treatment plans were inappropriate because Father entered incarceration twelve days after the District Court approved the first treatment plan, Father was incarcerated during the whole second treatment plan, and the District Court did not tailor that plan to fit a father in incarceration.  Parents must complete programs that the prison

offers them or allows them to complete. *See In re J.N.*, 1999 MT 64, ¶ 19, 293 Mont. 524, ¶ 19, 977 P.2d 317, ¶ 19.

¶52 Any portions of the tasks Father could have completed while incarcerated or during his periods not incarcerated are appropriate. Contrary to Father's assertion, the second treatment plan continued from January 2003 until the hearing in November 2003. He had twelve days before the State incarcerated him and five months after the State released him to complete the evaluations. Grant Larson, a social worker, testified that Father could have obtained the chemical dependency and psycho-sexual evaluation and maybe the psychiatric evaluation while in prison. Thus, the evaluation tasks were appropriate.

## FATHER'S ISSUE 3

¶53 Father argues the District Court abused its discretion in finding Father failed to complete his treatment plan. A parent must completely comply with a treatment plan; partial compliance or even substantial compliance is insufficient. *D.V.*, ¶ 27. Father had great opportunities–if not before, then after his incarceration–to obtain the evaluations, but he failed to do so. Father utterly failed to obtain a chemical dependency evaluation and a psychiatric evaluation. Assuming the psycho-sexual evaluations were inappropriate, the District Court committed harmless error by including them. *A.N.*, ¶ 41. Even discarding that psycho-sexual evaluation task, since Father failed two necessary and integral treatment plan tasks, the District Court did not abuse its discretion in finding that Father failed to complete his treatment plan.

## FATHER'S ISSUE 4

18

¶54 Father also argues that the District Court erred in determining that the conduct or condition rendering Father unfit was unlikely to change within a reasonable amount of time. To determine this, in addition to the emotional and mental illness element of § 41-3-609(2)(a), MCA (2001), a district court may take into account "a history of violent behavior by the parent; . . . ." Section 41-3-609(2)(b), MCA (2001). In the only psychological evaluation Father underwent, Dr. Peterson diagnosed him with Paranoid Personality Disorder with elements of narcissism and antisocial orientation. He refused all further evaluations. Father does not know his children's birth dates and that ignorance shows that he is too narcissistic to work to correct their developmental deficiencies if the children return to his care.

¶55 In 1991, California courts convicted Father of exhibiting a firearm during a threatened suicide. Taken together, these mental illnesses and violent tendencies pose a danger to the children's future welfare. The District Court did not commit clear error in determining he was unlikely to change within a reasonable amount of time.

¶56 Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ PATRICIA O. COTTER
/S/ JAMES C. NELSON
/S/ JOHN WARNER

/S/ JIM RICE