No. 04-848

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 139

IN THE MATTER OF D.G. and R.G.,

Youths in Need of Care.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
                In and For the County of Custer, Cause No. DN 2002-09
                Honorable Joe L. Hegel, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Wyatt A. Glade, Attorney at Law, Miles City, Montana

        For Respondent:

            Hon. Mike McGrath, Attorney General; Jennifer Anders,
            Assistant Attorney General, Helena, Montana

            Gary Bunke, Custer County Attorney, Miles City Montana
            Joseph M. Raffiani, Assistant Attorney General, Miles City, Montana

                                    Submitted on Briefs: April 26, 2005

                                    Decided:  June 7, 2005

Filed:

        _____
                            Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1      D.W. appeals from the judgment entered by the Sixteenth Judicial District Court, Custer County, on its order terminating her parental rights to R.G. and D.G., and granting the Montana Department of Public Health and Human Services (Department) permanent legal custody of the children with the right to consent to their adoption. We affirm.

¶2      The issue on appeal is whether the District Court abused its discretion in terminating D.W.'s parental rights.

## BACKGROUND

¶3      D.W. is the natural mother of C.W., R.G. and D.G. In July of 2002, the Department petitioned the District Court for emergency protective services and temporary investigative authority (TIA) over the three children based on allegations that they were abused and neglected, including that the oldest child, C.W., had been sexually abused. C.W.'s father is R.W. The District Court granted the Department emergency protective services and subsequently, after a show cause hearing, granted TIA. C.W. was removed from the home and placed in foster care, but R.G. and D.G. were allowed to remain with D.W. with the stipulation that their father, C.G., would move out of the home and comply with supervised visitation arrangements.

¶4      In November of 2002, the Department removed R.G. and D.G. from D.W.'s home because the children were allowed to have unsupervised contact with their father. That same month the Department petitioned the District Court for an adjudication that the three children were youths in need of care and requested the court grant the Department temporary legal

2

custody. At that time, D.W. and the Department entered into a court-approved treatment plan. In February of 2003, the District Court adjudicated the children youths in need of care and granted the Department temporary legal custody for six months. In June of 2003, the District Court approved a second treatment plan for D.W. covering the period from May 28, 2003, through August 23, 2003.

¶5 In July of 2003, the Department petitioned the District Court to terminate R.W.'s parental rights to C.W. and C.G.'s parental rights to R.G. and D.G. The Department also requested that, with regard to D.W.'s parental rights to the children, the District Court extend its temporary legal custody over R.G. and D.G. to allow D.W. time to comply with her treatment plan. At the same time, D.W. agreed to voluntarily relinquish her parental rights to, and give the Department permanent legal custody of, C.W. The District Court held a hearing on the petition in September of 2003, and subsequently entered its findings of fact, conclusions of law and an order terminating the parental rights of the birth fathers, R.W. and C.G., to the children and the parental rights of D.W. to C.W. The court further ordered that the Department's temporary legal custody of R.G. and D.G. be extended for a period not to exceed six months. D.W. and the Department then entered into a third court-approved treatment plan covering the period of September 5, 2003, through March 5, 2004.

¶6 In April of 2004, the Department petitioned the District Court to terminate D.W.'s parental rights to R.G. and D.G. The petition alleged that termination was appropriate because D.W. had failed to successfully comply with any of her three treatment plans and that the condition which rendered her unfit to parent her children was unlikely to change

3

within a reasonable time. The District Court held a hearing on the petition and, in November of 2004, entered its findings of fact, conclusions of law and order terminating D.W.'s parental rights to R.G. and D.G. D.W. appeals from this order.

STANDARD OF REVIEW

¶7 We will not overturn a district court's decision to terminate parental rights absent a showing that the court abused its discretion. *In re L.S.*, 2003 MT 12, ¶ 5, 314 Mont. 42, ¶ 5, 63 P.3d 497, ¶ 5. In determining whether the district court abused its discretion, we review the court's findings of fact to determine whether they are clearly erroneous and its conclusions of law for correctness. *In re L.S.*, ¶ 5.

DISCUSSION

¶8 Did the District Court abuse its discretion in terminating D.W.'s parental rights?

¶9 The District Court terminated D.W.'s parental rights pursuant to § 41-3-609, MCA, which provides, in pertinent part, as follows:

> (1) The court may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence . . . that any of the following circumstances exist:
>
> . . .
>
> (f) the child is an adjudicated youth in need of care and both of the following exist:
>
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
>
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

4

Based on the evidence presented at the hearing on the Department's petition to terminate D.W.'s parental rights, the District Court found that R.G. and D.G. had been adjudicated youths in need of care, D.W. and the Department had entered into three court-approved appropriate treatment plans, D.W. failed to successfully comply with any of the treatment plans and D.W.'s condition or conduct which makes her unfit to parent is unlikely to change within a reasonable time. Based on these findings, the court concluded that D.W.'s parental rights should be terminated. D.W. contends that the District Court abused its discretion in terminating her parental rights. Specifically, she asserts the court's finding that she failed to successfully comply with appropriate court-approved treatment plans is clearly erroneous because the Department failed to establish by clear and convincing evidence that the treatment plans were appropriate.

¶10 We have never established a precise test by which to determine whether a treatment plan is appropriate because of the uniqueness of each case involving potential termination of parental rights. *In re D.B.*, 2004 MT 371, ¶ 44, 325 Mont. 13, ¶ 44, 103 P.3d 1026, ¶ 44. However, we have identified several factors which are relevant in addressing whether a treatment plan is appropriate under the circumstances. These factors include whether the parent was represented by counsel, whether the parent stipulated to the plan and whether the treatment plan addresses the particular circumstances facing both the parent and the child. *In re D.B.*, ¶ 44.

¶11 Here, D.W. contends that her treatment plans failed to adequately address her particular medical and psychological problems and, therefore, they were inappropriate. In

this regard, D.W.'s second court-approved treatment plan required her to complete the following task:

> [D.W.] will obtain a medical or psychiatric diagnosis and treatment through a physician or a psychologist licensed in the state of Montana. [D.W.] will follow the recommendations of the physician or psychologist, including but not limited to management of any prescribed medication for her Bi-polar Disorder and medical diagnosis and/or treatment for ADHD.

D.W.'s third court-approved treatment plan contained an identical required task.

¶12 D.W. first argues that the above-referenced task was inappropriate because it required her to seek treatment and medication for bi-polar disorder. She asserts that no evidence of record supports a diagnosis that she suffers from the disorder and, thus, the treatment plan requires her to seek treatment for an incorrect diagnosis. We disagree.

¶13 At the hearing on the Department's petition for TIA in August of 2002, D.W. testified to the District Court that she suffered from bi-polar disorder for which she took medication and that she has known she has the disorder since she was 16 years old. Furthermore, in March of 2003, Dr. F. Tom Peterson (Peterson) performed a psychological evaluation of D.W. The medical history portion of Peterson's written evaluation states that D.W. informed him she had been diagnosed with bi-polar disorder at age sixteen. Additionally, the evaluation lists bi-polar disorder as a possible diagnosis and recommends D.W. receive treatment and medication from an appropriate medical professional for the condition. Finally, in June of 2003, D.W. was examined by psychiatrist Dr. Joan Dickson (Dickson). D.W. stated to Dickson that she previously had been diagnosed with bi-polar disorder. Dickson noted that, although it was possible D.W. had bi-polar disorder, Dickson could not

6

make that diagnosis after only a single visit. Based on the evidence of record, including D.W.'s own assertions on multiple occasions that she has the condition, we conclude that sufficient evidence exists supporting the required task in the second and third treatment plans that D.W. receive treatment and medication for bi-polar disorder.

¶14    D.W. also argues that the treatment plans were inappropriate because they failed to specifically address the fact that she had been diagnosed with post traumatic stress disorder (PTSD) and to recommend she receive treatment for the condition. The relevant task in both the second and third treatment plans required D.W. to obtain psychiatric diagnoses and treatment from a licensed physician or psychologist and follow all the recommendations of the physician or psychologist, "*including but not limited to* management of any prescribed medication for her Bi-polar Disorder." (Emphasis added.) In that regard, as a result of the psychological evaluation in June of 2003, Dickson diagnosed D.W. as having chronic PTSD. Dickson recommended D.W. begin medication for the condition and maintain regular contact with a doctor to monitor the medication. Thus, D.W. received a diagnosis of PTSD and recommendations for treatment from a licensed physician or psychologist. The "including but not limited to" language of the task in the treatment plans is broad enough to require D.W. to follow through with the recommendations regarding her PTSD diagnosis. The lack of specific reference to the PTSD diagnosis in the treatment plans does not render the plans inappropriate.

¶15    We conclude that sufficient evidence of record exists to establish that D.W.'s treatment plans were appropriate. We further conclude, therefore, that the District Court's

finding that D.W. failed to successfully comply with appropriate court-approved treatment plans is not clearly erroneous. D.W. does not challenge any other aspect of the District Court's findings of fact or conclusions of law regarding the termination of her parental rights. Consequently, we hold that the District Court did not abuse its discretion in terminating D.W.'s parental rights.

¶16     Affirmed.


/S/ KARLA M. GRAY


We concur:

/S/ JOHN WARNER
/S/ JIM RICE
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS